1  DENISSE O. GASTÉLUM, ESQ., SBN 282771
2  **GASTÉLUM LAW, APC**
   3767 Worsham Ave.,
3  Long Beach, CA 90808
   Tel: (213) 340-6112
4  Fax: (213) 402-8622
5  Email: dgastelum@gastelumfirm.com

6

7                    **UNITED STATES DISTRICT COURT**

8                    **CENTRAL DISTRICT OF CALIFORNIA**

9

10  DAVID ZUNIGA, an individual,        ) **CASE NO.**
                                        )
11                                      )
                                        ) **COMPLAINT FOR DAMAGES AND**
12                     Plaintiff,       ) **DECLARATORY RELIEF**
                                        )
13                                      )
14   vs.                               ) **1.  Excessive Force (42 U.S.C. § 1983;**
                                        )     **4th and 14th Amendments)**
15  CITY OF LOS ANGELES; CHIEF          ) **2.  Failure to Intervene (42 U.S.C.**
    MICHAEL MOORE; JORGE                )     **§ 1983; 4th and 14th Amendments)**
16  RODRIGUEZ; JESUS GARCIA; and        ) **3.  Municipal Liability—**
    DOES 1 to 10,                       )     **Unconstitutional Policy, Practice, or**
17                                      )     **Custom (42 U.S.C. § 1983)**
18                                      ) **4.  Municipal Liability—Ratification**
                                        )     **(42 U.S.C. § 1983)**
19                     Defendants.      ) **5.  Municipal Liability—Failure to**
20                                      )     **Train, Supervise, Discipline, or**
                                        )     **Correct (42 U.S.C. § 1983)**
21  _____   ) **6.  Declaratory Relief (28 U.S.C. § 2201)**
22

23

24                                        **JURY TRIAL DEMAND**

25

26

27

28

                                       1
─────────────────────────────────────────────────────────────
**COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF; DEMAND FOR JURY TRIAL**

# I.

## INTRODUCTION

1.      This action arises out of the unlawful use of force against Plaintiff David Zuniga during a peaceful protest at or near the intersection of Temple Street and Spring Street near City Hall of the City of Los Angeles on Friday, May 29, 2020. Plaintiff was present in the vicinity near a demonstration organized, in part, by Black Lives Matter Los Angeles to decry ongoing police violence perpetuated against communities of color, particularly Black people, across the United States.

2.      The peaceful exercise of freedom of speech and assembly on the evening of May 29, 2020 turned into a violent nightmare due to the escalatory and dangerous crowd control tactics employed by the City of Los Angeles—through the Los Angeles Police Department and its personnel Chief Michel Moore, Deputy Chief Jorge Rodriguez, Sergeant Jesus Garcia, and LAPD Officers DOES 1 through 10— resulting in Plaintiff suffering severe physical injuries following unprovoked use of so-called "less lethal" projectiles by law enforcement personnel.

3.      Defendants' improper and unlawful crowd-control tactics violated Plaintiff's rights under the U.S. and California Constitutions, as well as Plaintiff's statutory and common law rights. Accordingly, this lawsuit seeks to hold Defendants, and each of them, accountable for Plaintiff's life-threatening injuries and to put an end to each Defendants' unconstitutional conduct.

# II.

## JURISDICTION AND VENUE

4.      This case is brought pursuant to 42 U.S.C. §§ 1983. Jurisdiction is conferred on this Court based upon 28 U.S.C. §§ 1331 and 1343.

5.      This Court has the authority to grant the requested declaratory relief pursuant to 28 U.S.C. §§ 2201, as well as Federal Rules of Civil Procedure 57, including pursuant to the Court's inherent equitable powers.

COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF; DEMAND FOR JURY TRIAL

6.      Venue is proper within the Central District of California pursuant to 28 U.S.C. § 1391(b)(1) and (2) because all Defendants reside within this district and the events and omissions giving rise to Plaintiff's claims occurred within this district.

**III.**

**PARTIES**

7.      Plaintiff DAVID ZUNIGA (hereinafter referred to as "Plaintiff" and "Mr. Zuniga") was, at all relevant times, a 50-year-old monolingual Spanish-speaking Angeleno.  Plaintiff is, and at all times material hereto was, a resident of Los Angeles County.

8.      Defendant CITY OF LOS ANGELES (hereinafter referred to as "City") is a municipal corporation duly organized and existing under the Constitution and laws of the State of California. The Los Angeles Police Department ("LAPD") is a local government entity and an agency of the City, and all actions of the LAPD are the legal responsibility of the City. The City is charged by law with the administration and operation of the LAPD, including the employment, control, supervision, discipline, training, and practices of LAPD's personnel and employees, and with the formulation of its policies, practices, and customs of LAPD's personnel and employees. The City is sued in its own right on the basis of its policies, customs, and practices which gave rise to Plaintiff's federal rights claims.

9.      Defendant CHIEF MICHAEL MOORE (hereinafter referred to as "CHIEF MOORE") is, and at all times material hereto was, the LAPD police chief and a policymaker for his department.  Upon information and belief, CHIEF MOORE was present in person at the demonstration in Downtown Los Angeles on May 29, 2020 when Plaintiff sustained injuries following use of "less lethal" projectiles by law enforcement.  He is sued in both his individual and official capacities.

10.      Defendant JORGE RODRIGUEZ (hereinafter referred to as "RODRIGUEZ") is, and at all times material hereto was, a Deputy Chief with the LAPD and assigned to the position of Incident Commander of the Central Bureau

during the Floyd protests, covering Downtown Los Angeles ("DTLA"), for "B" watch during which time Plaintiff sustained injuries following use of "less lethal" projectiles by law enforcement. RODRIGUEZ participated in recommending and authorizing the deployment of "less lethal" munitions that injured Plaintiff. He is sued in both his individual and official capacities.

11.     Defendant JESUS GARCIA (hereinafter referred to as "GARCIA") is, and at all times material hereto was, an LAPD Sergeant assigned to LAPD's Central Traffic Division. Sergeant Garcia was present during the May 29, 2020 DTLA demonstration during which time Plaintiff sustained injuries following use of "less lethal" projectiles by law enforcement. Sergeant Garcia participated in recommending and authorizing the deployment of "less lethal" munitions that injured plaintiff. He is sued in both his individual and official capacities.

12.     On information and belief, Defendants DOES 1-8 are LAPD officers who needlessly accosted, assaulted, and, without any justification, injured Plaintiff David Zuniga (hereafter collectively, "Officer Defendants").

13.     At all relevant times, Defendant City was the employer of Defendants DOES 1-8. At the time of the incident, DOES 1-8 were acting under color of law within the course and scope of their duties as Officers for the LAPD. DOES 1-8 were acting with the complete authority and ratification of their principal, Defendant City.

14.     At all relevant times, DOES 9 and 10 were managerial, supervisorial, training, and/or policymaking employees of Defendant City. At the time of the incident, DOES 9 and 10 were acting under color of law within the course and scope of their duties as employees for the LAPD and/or the City. They had supervisorial authority over DOES 1-10, and the Officers and employees of the LAPD. DOES 9 and 10 were acting with the complete authority and ratification of their principal, Defendant City.

15.     DOES 1-10 are sued in both their individual and official capacities.

16.     On information and belief, DOES 1-10 were and still are residents of the County of Los Angeles, California.

COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF; DEMAND FOR JURY TRIAL

17.     The identities, capacities, and/or nature of involvement of the defendants sued as DOES 1 through 10 are presently unknown to plaintiff who therefore sues these defendants by fictitious names. Plaintiff is informed, believes, and thereupon alleges that DOES 1 through 10 include individual law enforcement personnel employed by the LAPD and LASD that were involved in some manner and are legally responsible for the wrongful acts and conduct alleged herein. Plaintiff will amend this complaint to substitute the Doe defendants' true names and capacities when they have been ascertained. Plaintiff is informed, believes, and thereupon alleges that each Doe defendant is a resident of California.

18.     Each of the defendants, including the Doe defendants, caused, and is responsible for, the unlawful conduct and resulting injuries suffered by plaintiff by, among other things, personally participating in the unlawful conduct, acting jointly, or conspiring with others who did so; by ordering, authorizing, acquiescing in, or setting in motion policies, plans, or actions that led to the unlawful conduct, by failing to take action to prevent the unlawful conduct; by failing and refusing to initiate and maintain adequate training and supervision; by failing to enact policies to address the constitutional rights of protesters despite the obvious need for such a policy; and by ratifying the unlawful conduct that occurred by agents and officers under their direction and control, including failing to take remedial or disciplinary action.

19.     Plaintiff is informed, believes, and thereupon alleges that, at all times relevant hereto, defendants, and each of them, acted as the agents, servants, and employees of each of the other defendants.

20.     In doing each of the acts and/or omissions alleged herein, defendants, and each of them, acted within the course and scope of their employment.

21.     In doing each of the acts and/or omissions alleged herein, defendants, and each of them, acted under color of authority and/or under the color of law.

///

///

**COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF; DEMAND FOR JURY TRIAL**

## IV.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### A. The Violent Response of Law Enforcement to Peaceful Protests.

22.     The recent brutal murders of George Floyd, Breonna Taylor and Ahmaud Arbery—the culmination of historical police oppression of the Black community—brought the United States to a crossroads.

23.     Upon the passing of George Floyd, residents of Minneapolis (where Mr. Floyd was murdered) took to the streets to denounce systemic racism and the history of violence which has targeted Black lives. Soon, hundreds of thousands of demonstrators across the country—in cities and towns large and small—joined Minneapolis in demanding immediate change, including the residents of Los Angeles County where, over the past 20 years, it is estimated that law enforcement has killed about three to four people each month.[1]

24.     The City is already a subject of numerous lawsuits challenging the unlawful use of force and detention against unarmed protesters.[2] Much of the complaints alleging excessive force have centered on the deployment of so called "less lethal munitions" ("LLM") and weapons, including such things as rubber bullets, batons, tasers, and pepper spray.

25.     "Less lethal" or "non-lethal" weapons are a deceptively monikered group of arms utilized by law enforcement for crowd control ostensibly without the intention to cause death. Although such weapons are less likely to kill the target than are conventional weapons such as firearms that shoot bullets, their use and misuse

---

[1] *Los Angeles Police Killings Database* (LA TIMES, June 9, 2020), available at: https://www.latimes.com/projects/los-angeles-police-killings-database/ .

[2] *See, e.g., LAPD Sued by Black Lives Matter-LA in Federal Court Over Mass Detention* (LA DAILY NEWS, June 5, 2020), available at: https://www.dailynews.com/2020/06/05/lapd-sued-by-black-lives-matter-la-in-federal-court-over-mass-detention/ ; *Peaceful Protestor Hit by LAPD Vehicle Files Government Claim* (PR Newswire, June 5, 2020), available at: https://www.prnewswire.com/news-releases/peaceful-protestor-hit-by-lapd-vehicle-files-government-claim-301071482.html

**COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF; DEMAND FOR JURY TRIAL**

1  can result in serious and permanent bodily harm, and have also caused death.[3]

2  26.    This excessive and unlawful use of force against peaceful demonstrators

3  is a deliberate, first-line tactic which is embedded in the institutional culture of the

4  City.

5  27.    "[I]n most cases killing is just not that big of a deal"[4] is a cavalier

6  sentiment expressed by Dave Grossman while instructing law enforcement personnel

7  in "Killology", a neologism coined by Grossman to describe "the scholarly study of

8  the destructive act".[5] A former Army Ranger, Grossman prides himself as an

9  authority on aggression and devotes his time to traveling throughout the country

10  teaching law enforcement personnel on how to become more effective killers. His

11  books on the subject are required reading at the FBI academy and police academies

12  across the U.S. [6] In essence, Grossman's philosophy—expounded using fear

13  mongering imagery to characterize those killed by law enforcement as "terrorists"

14  and "gang bangers"— advocates a "warrior" mentality amongst law enforcement that

15  does not hesitate to use deadly force or regret its consequences.[7] And, not without

16  correlative results. The officer who murdered Philando Castile in 2016 had taken a

17  class with Grossman just two years before the shooting.[8]

18

19  [3] See United Nations Public Order Management, *Less Than Lethal Weapons* (UN Peacekeeping
    PDT Standards for Formed Police Units, 1st Edn. 2015), available at:
20  http://repository.un.org/bitstream/handle/11176/387390/Less%20Than%20Lethal%20Weapons.pdf
    #page=7 . LLMs include rubber bullets; rubber buckshot; soft polymer rounds; wax bullets; plastic
21  bullets; beanbag rounds; sponge grenades; ring airfoil projectiles (both kinetic and tear gas
    projectiles); and rubber bullets with electroshock effect (e.g. Taser XREP rounds).
22  [4] "*Enjoy the Killing*" Do Not Resist at 0:20 (YOUTUBE, March 1, 2019), available at:
23  https://www.youtube.com/watch?v=PwEYhIX4cbM&t=22s .
    [5] See https://www.grossmanacademy.com/about-the-colonel .
24  [6] See "*Are You Prepared to Kill Somebody?" A Day With One of America's Most Popular Police
    Trainers* (MOTHER JONES, March, 2017), available at:
25  https://www.motherjones.com/politics/2017/02/dave-grossman-training-police-militarization/
26  [7] Kelly McLaughlin, *One of America's Most Popular Police Trainers is Teaching Officers How to
    Kill* (INSIDER, June 2, 2020), available at:
27  https://www.insider.com/bulletproof-dave-grossman-police-trainer-teaching-officers-how-to-kill-
    2020-6
28  [8] *Id.*

28.    The City enrolled some 600 LAPD personnel in one of Grossman's "trainings" where, reportedly, a LAPD detective informed Grossman that he was the first individual in twenty years to tell her: "it's ok. That [sic] not feel bad about killing that guy." [9] Upon information and belief, the City—through the LAPD—has hosted Grossman's trainings for its law enforcement personnel on numerous occasions over the years.

29.    In May 2009, the California Homeland Security Response Conference, held in Palm Springs, California and chaired by LAPD Deputy Chief Michael Downing and including LASD Detective Don Lord; LAPD Officer Jim Buck; and Jon A. Winstanley of the LAPD Counter Terrorism & Criminal Intelligence Bureau as part of its Steering Committee, hosted training sessions by Grossman titled "Terrorism and Human Aggression" and "Bullet Proof Mind" for the City's law enforcement personnel.[10] This training was organized, supervised, and ratified by the City.

30.    Grossman's dangerous pseudo-scientific pontifications—which have been widely disseminated by the City to its law enforcement personnel—are part and parcel of a larger industry of militarized and fear-based law enforcement educators such as psychologist William Lewinski, whose work has been roundly rejected by the scientific community.[11]

31.    This "shoot first" mentality is endemic within the LAPD and perpetuated by the policies, practices, and customs of the City, directly contributing to the disastrous and tragic outcomes when the LAPD are deployed in response to peaceful protesters—such as plaintiff—exercising their Constitutional rights.

---

[9] "*Enjoy the Killing*" Do Not Resist at 1:12 (YOUTUBE, March 1, 2019), available at: https://www.youtube.com/watch?v=PwEYhIX4cbM&t=22s .

[10] CFED, California Homeland Security Response Conference (May 13-2009), Conference Agenda at 3, 6, 7, available at: http://lib.store.yahoo.net/lib/yhst-129183456818554/cfed-west.pdf .

[11] Zachary Siegel, *Is the Psychology of Deadly Force Ready for the Courts?* (SCIENTIFIC AMERICAN, December 20, 2018), available at: https://www.scientificamerican.com/article/is-the-psychology-of-deadly-force-ready-for-the-courts/

**COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF; DEMAND FOR JURY TRIAL**

32.    The City has a long, troubled history of employing unlawful suppression tactics in response to protests. [12] Over the course of the last several decades, the City has been sued repeatedly for much of the same conduct challenged herein, including excessive force with rubber bullets. For example, on May 1, 2007, the LAPD engaged in a substantially similar use of the same type of unlawful force complained of herein against peaceful marchers in the MacArthur Park area of the City of Los Angeles, resulting in a subsequent class action lawsuit and Structural Relief Order being issued which set forth specific grounds for the use of LLMs when the LAPD engages in crowd control. *Multi-Ethnic Worker Organizing Network v. City of Los Angeles* (C.D. Ca. CV 07-3072 AHM). As discussed below, the City utterly failed to follow the mandates of the Structural Relief Order in the instant matter.

**B. Plaintiff David Zuniga Is Shot in the Head By LAPD Officers Who Fired Less Lethal Munitions Indiscriminately at the Crowd.**

33.    On the evening of May 29, 2020, Plaintiff was present near a peaceful protest in Downtown Los Angeles at or about the intersection of Temple and Spring Streets, near City Hall.

34.    That evening, Defendant RODRIGUEZ was assigned to the position of Incident Commander of the Central Bureau during the Floyd protests, covering Downtown Los Angeles, for "B" watch during which time Plaintiff sustained injuries following use of "less lethal" projectiles by law enforcement. RODRIGUEZ participated in recommending and authorizing the deployment of "less lethal" munitions that injured Plaintiff.

35.    That evening, Defendant GARCIA was the squad leader of a MFF in front of the police headquarters facility.  GARCIA authorized the use of 37 mm and 40 mm less lethal munitions. GARCIA's squad kettled the crowd to Spring Street and

---

[12] *See LAPD Violence Against George Floyd Protests Erodes A Decade of Reforms* (LA TIMES, June 14, 2020), available at: https://www.latimes.com/california/story/2020-06-14/lapd-protest-history-criticism-heavy-tactics

**COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF; DEMAND FOR JURY TRIAL**

Temple Street where Plaintiff was present.

36.    The decision to exercise unreasonable force by deploying LLMs against Plaintiff and the crowd of peaceful demonstrators was recommended and authorized by CHIEF MOORE, RODRIGUEZ, GARCIA. The use of LLMs against protesters was authorized at or around 7 p.m. on May 29, 2020 and continued well beyond the time that Plaintiff was injured.

37.    Defendants declared nearly all of Downtown Los Angeles an "unlawful assembly" and imposed an immediate curfew for the area. The curfew was announced on the LAPD and Mayor Garcetti Twitter accounts, and at Mayor Garcetti's press conference.

38.    On Twitter, the LAPD wrote: "This [curfew order] is being made following repeated acts of violence and property damage. Residents should stay inside. Business should close. Those on the street are to leave the area."

39.    This was inadequate notice as it is unlikely that all, most or even many of the 10 million residents of the City follow the LAPD on Twitter.

40.    During that time, Plaintiff was at Grand Park near his home watching a movie on his phone. He did not hear the curfew order nor did he hear an order to disperse.

41.    Between the evening hours of 8:30 p.m. and 9:00 p.m., Mr. Zuniga observed the police form a line and begin pushing the protestors toward City Hall. Approximately 100-200 people were assembled. The crowd moved in compliance with the police orders, but each time the demonstrators did so, they were met by other lines of police officers that blocked them.

42.    Mr. Zuniga observed an ever-increasing number of LAPD officers arrive and attired in riot gear, heavily armed and forming what appeared to be an impenetrable wall of officers stretching across a wide area encircling the protestors.

43.    The demonstrators realized that they were being herded by the police into a confined space as a group and completely surrounded by officers. Mr. Zuniga and

**COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF; DEMAND FOR JURY TRIAL**

others asked to leave the demonstration but were refused by the officers at the scene.

44.    Suddenly and without warning, Plaintiff heard shots being fired. The LAPD officers fired LLMs indiscriminately at the crowd.

45.    Repeatedly and indiscriminately, DOES 1-8 officers deployed less-lethal weapons, shooting what are only authorized as target specific into crowds of protestors, including protestors kettled by officers and at the back of protestors as they ran away from officers displaying and shooting at them.

46.    Plaintiff David Zuniga was shot in head. Plaintiff felt immediate pain to his head. He began to bleed, fell to the ground, and lost consciousness temporarily.

47.    Through confusion and disorientation, Plaintiff begged for LAPD's aid and assistance but was completely ignored because the officers were continuing to advance on the crowd.

48.    Two hours later, at about 11:00 p.m., Plaintiff received emergency medical care and was transported to a nearby hospital.

49.    Plaintiff's injuries are still being evaluated by medical professionals. As a direct and proximate result of being shot by law enforcement personnel, Plaintiff suffered a serious heady injury and laceration to his head. As a further direct and proximate result, Plaintiff continues to experience, inter alia, hearing loss, sensitivity to the scar, recurrent headaches, dizziness, nausea, and mental confusion, and further suffers from fear of crowds, fear of police, physical pain, mental suffering, loss of enjoyment of life, physical impairment, inconvenience, grief, anxiety, depression, and emotional distress.



50.    Plaintiff's injuries resulting from the LAPD Officers firing LLMs indiscriminately at a crowd were known consequences from this type of abusive police behavior.

## V.

## FACTUAL ALLEGATIONS COMMON TO *MONELL* CAUSES OF ACTION

51.    Based upon the principles established in *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), Defendants are liable for all injuries sustained by Plaintiff as set forth herein. The City has failed to train its officers in the constitutional responses to peaceful demonstrations, and its officers' actions were the result of custom, policy, or practice, inadequate supervision, instruction, and discipline. The City has condoned the Constitutional rights violations and abuses that are the subject of this action and have thereby encouraged and ratified such conduct.

52.    The LAPD engaged in violations of law, as outlined above, by the use of indiscriminate and excessive and unreasonable force against Plaintiff. The excessive and unreasonable force inflicted upon Plaintiff by the LAPD occurred through the use of LLMs while Plaintiff was present near a peaceful demonstration on May 29, 2020.

53.    Specifically, the Doe officers fired LLMs at Plaintiff, thereby incapacitating Plaintiff and causing severe and permanent physical injuries. Upon information and belief, the use of LLMs by the Doe officers was authorized by GARCIA in consultation with RODRIGUEZ and ratified by CHIEF MOORE.

54.    The injuries to Plaintiff resulted from the LAPD's policies, both affirmative and deficient, and the LAPD's nearly total lack of adequate training on the use of less lethal munitions.   Department policy directs that: "The 40mm LLL shall not be used to target the head, neck, face, eyes, or spine unless lethal force is authorized. The minimum recommended deployment range for the 40mm LLL is five feet, while the effective deployment range is up to 110 feet. Officers should always consider weapon retention principles when deploying the 40mm LLL to prevent a subject/suspect from gaining control of the launcher."

55.     As Chief of the LAPD, CHIEF MOORE was fully knowledgeable and apprised of these actions and, upon information and belief, was present during the May 29 demonstration in Downtown Los Angeles, observing and directing the operation of his officers, without repudiating or stopping the actions of the LAPD officers, thereby ratifying them. Moreover, in his reports to the Police Commission and in other public statements, CHIEF MOORE stated repeatedly that the actions of the LAPD officers were proper.

56.     CHIEF MOORE further delegated responsibility and authority to persons within his command staff to act as the final policy maker in determining the response to the May 29, 2020 assembly in Downtown Los Angeles, specifically at the site where Plaintiff was injured. The persons who made these decisions acted as the delegated policy maker for the City of Los Angeles on these issues.

57.     Moreover, CHIEF MOORE and his delegated command staff were at all relevant times aware that the use of unlawful or inadequate dispersal orders and LLMs—such as LLMs—to break up lawful protests, in particular, is a custom so ingrained in the marrow of the LAPD that it was critical for leadership to ensure that official policy was trained and implemented in a manner sufficient to address the custom to violate First Amendment rights in the specific ways identified in the *National Lawyers Guild* settlement agreement. The failure to take these necessary steps directly and proximately lead to the injuries suffered by plaintiff in the instant matter. This failure amounted to an "acquiescence in the constitutional deprivations of which [the] complaint is made" and deliberate indifference to the rights of persons with whom the police come into contact, and constituted a conscious choice by the City not to properly train its law enforcement personnel on these issues.

58.     In conjunction with Defendants' long history of protest-related constitutional violations as alleged in this Complaint, each Defendants' repeated unlawful acts on May 29, 2020 constitute a *de facto* policy, practice, and/or custom of violating protesters' constitutional rights, including the constitutional rights of

plaintiff. Such policy, practice, and/or custom was the direct and proximate cause of plaintiff's injuries.

59.     These violent law enforcement responses prompted several investigations into the LAPD's actions during the May-June 2020 protests:

**A. Chaleff After-Action Report**

60.     On June 30, 2020, the Los Angeles City Council ("City Council") approved a motion directing the LAPD to prepare an After-Action Report reviewing the LAPD's actions during the May-June 2020 protests. The City Council requested that Gerald Chaleff, the author of LAPD's review of the 2007 May Day protests, lead the review. The LAPD ultimately decided to conduct its own after-action review.

61.     Mr. Chaleff and his review team[13] prepared "An Independent Examination of the Los Angeles Police Department 2020 Protest Response," ("Chaleff's After-Action Report"), which was transmitted to the City Council on March 10, 2021.

62.     The Chaleff After-Action Report found the LAPD's response to the May-June 2020 protests deficient in the following areas: (1) planning, (2) command and control, (3) public order policing, (4) less lethal tools, (5) mass arrests, (6) preparedness and training, and (7) wellness. The Report lists 67 findings across these six areas.

63.     The "Planning Findings" include the following:

        a.      "There was a lack of a unified message from City leaders to de-
                escalate the violence so that peaceful protestors could exercise
                their First Amendment rights."

        b.      "There was a lack of firm executive-level direction to the
                Department command officers to prepare and plan for potential
                widespread civil unrest and demonstrations which contributed to
                the problems cited throughout this report."

---

[13] Mr. Chaleff led a review team consisting of other retired LAPD officers and a law enforcement consultant.

**COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF; DEMAND FOR JURY TRIAL**

64. The "Public Order Policing Findings" include the following:

    a.   "There was a lack of training to properly prepare command officers for managing large crowds with the possibility of civil unrest and many command officers stated they did not feel confident in handling these incidents."

65. The "Less Lethal Tools Findings" include the following:

    a.   "The deployment of less lethal munitions was not always done at the direction of a supervisor or officer. In some instances, officers were directed to be in front of a skirmish line and left to deploy less lethal tools, including the 40 mm, with no direction or coordination."

    b.   "The Department's Use of Force Tactics directive authorizing the use of 40mm has no detailed guidance on use in public order policing situations."

    c.   "[T]he Review Team did not find the two hours of training to be sufficient given the skill level needed to deploy the 40mm in a chaotic public order policing environment."

    d.   "Officers are required to be trained one time on the 40mm system. Deploying the 40mm in public order policing situations requires recurring certification and training."

    e.   "The last training for the 40mm for officers, other than those going through recruit training, was in 2018."

66. The "Preparedness and Training Findings" include the following:

    a.   "Annual, hands on training on public order policing for command staff diminished over time resulting in many command staff in 2020 not being prepared for the civil unrest."

    b.   "[A]dditional training and mentoring in crowd control tactics and specific incident command system positions, such as incident

commander, operations chief, logistics, etc. are needed and should be conducted on an annual basis."

    c.    "Training on the 40mm system use during crowd control situations was insufficient."

67.    The Chaleff After-Action Report issued 22 recommendations, which include:

    a.    "Undertake an extensive study of all less lethal munitions, including the 40 mm round, to examine performance, consistent velocity, potential for ricochets, influence of the plastic wrapping or banding around the sponge projectile and other aspects of the round. Included in that study should be any potential new technology for use in public order policing operations."

    b.    "Design and implement an inventory system to audit and track the amount of less lethal munitions, including the 37mm and 40mm rounds, expended during any public order policing incidents."

    c.    "Update the use of force tactical directives to include more detailed instruction regarding the use of less lethal tools in crowds and the approval level required for the deployment of each the less lethal."

    d.    "Establish protocols that: (a) Only trained (certified) members of Metropolitan Division or officers who receive consistent and periodic instruction and certification in the 40mm system should be allowed to deploy the 40mm during crowd control situations, (b) Retain the use of the 40mm system for all other officers during patrol duties and ensure annual retraining of weapon manipulations during shotgun qualification, and (c) Mandate the use of body worn video (when feasible) to record problem

**COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF; DEMAND FOR JURY TRIAL**

behavior of individuals in the crowd when officers decide to use the target specific 40mm in a crowd control situation."

68.     The Chaleff Report documented the lack of training on the use of less-lethal munitions.  According to this report, the LAPD changed its training in 2017 and the revised presentation cut the course time by 50% or more.  From 2007 to 2009, following the May Day 2000 police assault on peaceful demonstrators in MacArthur Park with batons and less lethal munitions, the LAPD instituted a 10-hour Crowd Management/Crowd Control course that all sworn personnel were required to attend. This training diminished over the years until, by 2015, ongoing training was largely eliminated.

69.     The Chaleff Report found the general training on crowd control to be inadequate and also concluded the training on use of 40mm munitions to be insufficient.  At the time of the Floyd protests in 2020, the training was a 2-hour module on use of the 40mm, taking up half of the inadequate four-hour crowd control block.

70.     According to the manufacturers specifications, the 40mm munition travels at 325 feet per second.   LAPD policy sets a minimum distance of five feet from the target and a maximum of 110 feet for the 40mm deployment. LAPD policy restricts use of the 40 mm weapon and all less lethal force to situations where an officer reasonably believes that a "suspect or subject is violently resisting arrest or poses an immediate threat of violence or physical harm."  The policy specifically prohibits targeting a person's head and upper torso unless lethal force is authorized. In a crowd situation, it may only be used as a target specific weapon and not to disperse a crowd.

71.     At the time of the Floyd protests, training for patrol officers deploying 40mm weapons was primarily limited to the 2-hour block, with limited opportunity to actually shoot the weapon and then only at a static target. According to the Chaleff Report, in 2017, when the LAPD expanded use of the 40mm weapon for regular

**COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF; DEMAND FOR JURY TRIAL**

patrol officers, the LAPD determined that the two-hour component and one-time qualification was adequate.

72.     The decision to limit training appears to be largely economic.  The Chaleff Report noted the cost of each round at approximately $25, "making it too expensive to certify [requalify] the entire Department on a regular basis."

73.     The Chaleff Report concluded that the one-time two-hour training on the 40mm was inadequate, especially when the weapons were deployed in  "chaotic public order policing situations[,]".

74.     The other munitions used by the LAPD during the Floyd protests were the 37mm launcher and the beanbag shotgun.  The 37 mm weapon is non-target specific and only allowed to be skip-fired from a minimum of 15 feet and a maximum of 30 feet.   With approval of the Incident Commander, it may be used for crowd control when a dispersal order was issued or there is an immediate threat of violence, ensure public safety and restore order."    The use of the 37mm munition as a direct impact weapon requires approval of the Incident Commander.  In this action, the LAPD gave blanket authorization to deploy the 37mm weapon without knowledge of the specific facts giving rise to a justified deployment.

75.     The beanbag shotgun is permitted in crowd control situations as a target specific less-lethal option against a single individual.  The restricted body impact zones for the beanbag are generally the same as for the 40mm weapon.

76.     The Chaleff Report concluded that most injuries from less-lethal weapons resulted from the 40mm weapons. Chaleff identified the pros and cons of the 40mm weapon in a crowd control situation.  On the one hand, the 40mm has a greater effective range which makes "precise, target -specific shots at distance possible, but also magnifies issues such as marksmanship (or lack thereof) and movement of the target," and concluded that "a greater level of training, marksmanship and competency is necessary" with the 40mm.

77.      More specifically, in viewing some of the video of these events, the Chaleff Report found "there were instances where officers quickly fired the 40mm

**COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF; DEMAND FOR JURY TRIAL**

rounds at distant targets which increase[d] the likelihood of hitting an unintended target."

**B. NPF After-Action Report**

78.   In July 2020, the Los Angeles Board of Police Commissioners asked the National Police Foundation ("NPF") to conduct an after-action review assessment, and analysis of the LAPD's actions during the May-June 2020 protests. The Los Angeles Police Foundation funded the National Police Foundation's after-action review.

79.   The National Police Foundation's Report, "A Crisis of Trust: A National Police Foundation Report to the Los Angeles Board of Police Commissioners on the Los Angeles Police Department Response to First Amendment Assemblies and Protests Occurring May 27 – June 7, 2020" ("NPF After-Action Report) was released on April 9, 2021.

80.   The NPF After-Action Report lists 22 findings, which include:

a.   LAPD's policies and practices "were inadequate to handle the disparate groups, or to identify leaders amongst the protesters and address the level of violence."

b.   "Some LAPD personnel had not been provided contemporary training on crowd management, mobile field force, supervision, de-escalation, or the use of less-lethal instruments prior to the First Amendment assemblies and demonstrations from May 27 through June 7, 2020. Many of the LAPD training bulletins, courses, and directives related to crowd management and control were outdated."

c.   LAPD "do[es] not have one policy directing response specifically to large scale, fluid, city-wide civil unrest that turns violent or contains violence."

d.   Communication "between the Chief, his command staff, bureau commanders and field supervisors, and line officers" was

**COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF; DEMAND FOR JURY TRIAL**

inconsistent and "created significant challenges regarding: (a) identifying a cogent operating philosophy; (b) determining operations during individual shifts, including when shifts started and ended; and, (c) establishing coordination and consistency between shifts." This "impacted every component of the LAPD response" to the protests. 82.

81.   The NPF's recommendations include:

a.   "LAPD should synthesize the relevant provisions spread throughout the current Department and clearly establish guidelines for the coordination, facilitation, and management of First Amendment assemblies and protests."

b.   "LAPD should review national and international best practices regarding the impact of police actions on First Amendment assembly and protest participants."

c.   LAPD should "develop[] strategies, tactics, and Mobile Field Force teams to more effectively respond to these types of First Amendment assemblies and protests, which are becoming more frequent in the City and nationwide."

d.   "LAPD should consider developing an overarching 'response to fluid dynamic protests and civil unrest' policy that provides for the nuances of this type of event, incorporates critical thinking skills and offers decision making models to guide at what points uses of force and relevant tools are permitted to be used by LAPD officers."

### C. LAPD Internal After-Action Report

82.   LAPD's after-action report, "SAFE LA Civil Unrest 2020 After Action Report," ("LAPD Internal After-Action Report") was released on April 9, 2021.

83.   According to the LAPD, officers deployed 11,305 rounds of "less-lethal munitions" during the May-June protests, comprised of:

**COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF; DEMAND FOR JURY TRIAL**

a.      4,377 37mm projectile rounds

b.      2,621 40mm projectile rounds

c.      4,307 beanbag shotgun rounds

84.     The LAPD's Internal After-Action Report list recommendations in twenty- six areas of improvement. Some of these recommendations highlighted the LAPD's inadequate command and control training and deficiencies regarding communications and unity of command. 85. One specific recommendation is: "The Department used a significant amount of less-lethal munitions to protect the City and restore order. The Department should continue to research and seek best practices related to the deployment of less-lethal munitions. This should include an examination of the Department's current less-lethal capabilities and new available technologies. A clear understanding regarding when to deploy less-lethal and the level of approval necessary should be reiterated and clarified to avoid confusion. When less-lethal is deployed, when available it should be used in conjunction with BWV to capture the activity leading up to the decision to use less-lethal. Officers trained in less-lethal should attend annual weapons manipulation training."

85.     The LAPD Internal After-Action Report does not address the thousands of citizen complaints arising from these protests.

86.     Despite all evidence to contrary, Chief Moore stated that the "vast majority of [LAPD] personnel performed admirably" during the protests in his letter to the Police Commission accompanying the LAPD Internal After-Action Report.

**D. SAFE LA Task Force**

87.     The SAFE LA Task Force was established to handle personnel complaints arising out of the May-June 2020 protests.

88.     On April 9, 2021, the Board of Police Commissioners received the "SAFE LA Task Force Update Report" from Chief Moore.

89.     According to the Report, the Office of the Inspector General received 2,850 personnel complaints related to the protests. The SAFE LA Task Force initiated

**COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF; DEMAND FOR JURY TRIAL**

1    210 complaint investigations, of which 73 were related to excessive use of force. As

2    of April 9, 2021, 33 of these investigations were reviewed and no allegations for

3    unauthorized force were sustained.

4         **E. LAPD Officer of Inspector General**

5         90.    In a 2022 report, the LAPD Office of the Inspector General ("OIG")

6    reported that "crowd control situations are often the source of substantial numbers of

7    significant uses of force by Department officers, including deployment of less-lethal

8    weapons and munitions."  The OIG illustrated this point by citing to the 2020 Floyd

9    protests, where "officers fired the 40mm Less-Lethal Launcher 2,621 times during

10   the 'SAFE LA' crowd control incidents that occurred in mid-2020, and they fired the

11   beanbag shotgun 4,307 times.  Additionally, officers fired the 37mm Less Lethal

12   Launcher, which is only authorized for use in crowd control situations, a reported

13   total of 4,377 times." [14]

14        91.    Using the numbers in the preceding paragraph, the LAPD fired a total of

15   11,305 munitions at the Floyd protestors.  Plaintiff's injuries, as well as the

16   widespread injuries suffered by protestors and innocent bystanders during the May-

17   June protests, which were caused by the deployment of the less lethal weapons,

18   resulted from, most fundamentally, the grossly inadequate training on this highly

19   perishable skill.  The lack of practice with these weapons – "less lethal," not "non-

20   lethal" – and the blanket advance authorization to deploy these weapons, regardless

21   of whether a specific situation was justified according to LAPD policy, resulted in

22   identifiable and serious injuries to dozens of persons during the Floyd protests,

23   including Plaintiff.

24        **F. LAPD's History of Lawsuits Resulting from Excessive Force at Protests**

25        92.    The City has failed to train their officers in the appropriate constitutional

26   responses to peaceful demonstrations. Specifically, Defendants have failed to provide

27   

28   [14] LAPD Safe LA Civil Unrest 2020 After Action Report, p.74, available at:
     https://lapdonlinestrgeacc.blob.core.usgovcloudapi.net/lapdonlinemedia/2021/11/BPC_21-066.pdf

**COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF; DEMAND FOR JURY TRIAL**

1  adequate training for: 1) proper crowd control and dispersal methods; and 2) proper

2  use of LLMs in crowd control tactics.

3      93.    Upon information and belief, the City maintains policies, including the

4  routine use of tactics, that are escalatory by nature, including the use of riot gear and

5  LLMs at demonstrations and protests for crowd control purposes, thereby placing

6  demonstrators such as plaintiff at risk of serious injury. The City's escalatory and

7  dangerous policies and practices include, *inter alia*, hosting training for their officers

8  in "killology"—which, as described above, advocates the free, and often

9  indiscriminate, use of deadly force by law enforcement.

10      94.    The rights of Plaintiff that were violated in the instant matter were

11  clearly established long before the incident on May 29, 2020.

12      95.    Upon information and belief, the City participates in the California

13  Commission on Peace Officer Standards and Training ("POST"). As participating

14  agencies, defendants agree to abide by the standards established by POST.

15  Defendants' conduct, as alleged herein, failed to comply with POST guidelines on

16  crowd management, intervention, and control.

17      96.    The need for training and discipline to enforce constitutional guarantees

18  in peaceful demonstrations is obvious, yet Defendants have failed to promulgate

19  adequate policies in accordance with federal law and/or to train its command staff

20  and officers on appropriate policies, if any exist.

21      97.    The City has known of the deficiencies in the training of its officers in

22  such circumstances since at least 2000 and entered into a settlement agreement in

23  June 2005 and June 2009, each time agreeing to revised policies and training, yet the

24  City has failed to promulgate adequate policies effectuating the terms of the

25  settlement agreement and/or to train its command staff and officers on the revised

26  policies, if any exist. This constitutes a separate *Monell* violation from those outlined

27  above.

28  ///

**COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF; DEMAND FOR JURY TRIAL**

98.    The City is well aware of its constitutional duties in these circumstances in light of the settlement agreements and consent judgments discussed below in *National Lawyers Guild v. City of Los Angeles* and *Multi-Ethnic Worker Organizing Network v. City of Los Angeles. City of Los Angeles*, as well as other settlements entered into specifying these constitutional duties over the years.

### 1.   The Settlement in *National Lawyers Guild v. City of Los Angeles*

99.    In June 2005, the City of Los Angeles entered into a settlement agreement in *National Lawyers Guild, et al. v. City of Los Angeles, et al.*, CV 01-6877 FMC (CWx), an action arising from the disruption of lawful assemblies and use of unlawful force during the Democratic National Convention ("DNC") in Los Angeles in 2000 and a subsequent demonstration on October 22, 2000. The settlement provided for important changes in the policy and practices of the LAPD as applied to demonstrations.

100.    Significantly, the settlement addressed the use of LLMs and chemical irritants to disperse peaceful protesters. Also, the settlement provided that, prior to declaring an unlawful assembly, the LAPD Incident Commander should evaluate the feasibility of isolating and arresting those responsible for any unlawful conduct, and if feasible, take action only against those individuals.

### 2.   The Settlement in *Multi-Ethnic Worker Organizing Network v. City of Los Angeles* ("MIWON")

101.    On May 1, 2007 ("May Day"), the LAPD assaulted a peaceful, permitted immigration march in the MacArthur Park area of Los Angeles. Like here, the attack on demonstrators was without warning. No dispersal order was given until more than three minutes into the police action and, even then, the dispersal order was grossly inadequate, given from helicopters in English to a largely Spanish-speaking assembly. During the course of litigating the MIWON action, the LAPD conceded that it had not fully implemented training and policy orders regarding the NLG settlement two years earlier. In fact, no policy changes were ever finalized.

1       102.   On June 24, 2009, the federal district court approved and entered a

2 Structural Relief Order as part of the settlement of the class action lawsuit brought on

3 behalf of all those subjected to the LAPD's May Day action.

4       103.   In a section titled "Use of Less Lethal Weapons", the Order states:

       a.    Less-lethal munitions may be deployed on ***aggressive and/or combative suspects*** in a crowd control situation, on suspects who are a ***potential physical threat*** to themselves or others, or suspects displaying 'aggressive' and/or 'combative' actions.

       b.    For the purpose of deployment of less-lethal munitions, 'aggressive' and/or 'combative' actions include ongoing destruction of property that presents a threat to the personal safety of officers or others.

       c.    Less lethal weapons should not be used on a lawfully dispersing crowd or individual.

       d.    Less lethal weapons ***should not be used against a person or a crowd that is retreating*** unless the person or crowd continues to engage in unlawful activity that is aggressive and/or combative.

       e.    Where feasible, ***notice should be given to the crowd before less lethal weapons are deployed*** in a crowd control or dispersal situation, and where feasible, it should be given in the language(s) spoken by those assembled.

       f.    If the LAPD resumes the use of stinger rounds, the LAPD will publish a notice that will require that less-lethal stinger weapons can be used only with the approval of a staff officer (i.e., commander or above) and only in a riotous situation where the use of lethal force would not be reasonable.

(emphasis added).

**COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF; DEMAND FOR JURY TRIAL**

1    104.   As demonstrated throughout this Complaint, *none* of the conditions

2    authorizing the use of LLMs in the Order existed when LAPD officers

3    indiscriminately shot at the crowd, striking and injuring Plaintiff by less lethal

4    munition on May 29, 2020.

5    105.   Moreover, the Order set out specific requirements to declare an unlawful

6    assembly: an amplified loudspeaker system with an officer at the far side of the

7    crowd to record the officer; if there is no serious violence occurring, the order shall

8    be made repeatedly over a period of time, including an "objectively reasonable period

9    of time to disperse and identification of "a clear and safe route" to follow to disperse.

10   The order should be given so that it is heard by the entire crowd. These requirements

11   were not met in this instance at the location(s) where plaintiff was demonstrating and

12   at the site where he sustained injuries. At no time did plaintiff receive a dispersal

13   order or warning prior to being shot and injured.

14   106.   The terms of the *MIWON* structural relief agreement were to be included

15   in the LAPD's Crowd Control and Use of Force Manuals and every officer at the

16   rank of Sergeant I and above, as well as the entire Metropolitan Division, were to

17   undergo training every two years. CHIEF MOORE, as well as those members of his

18   command staff to whom he has delegated his responsibility to enact and implement

19   lawful policies for responding to demonstrations, are aware of the unlawful policies,

20   practices, and customs of the City and the LAPD which resulted in the settlement in

21   *National Lawyers Guild v. City of Los Angeles* in June 2005.

22              **3.   The Settlement in *Aichele v. City of Los Angeles***

23   107.   A class action for injunctive relief and damages for arrests and related

24   actions regarding the shutdown of Occupy LA's use of the City Hall lawn in 2011.

25   The $2.45 million settlement in *Aichele v. City of Los Angeles*, No. CV 12-10863-

26   DMG (FFMx) (C.D. Cal.) included that LAPD officers should not "kettle" protestors

27   attempting to comply with a dispersal order.

28   ///

**COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF; DEMAND FOR JURY TRIAL**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

#### 4.   The Settlement in *Charmaine Chua, et al. v. City of Los Angeles*

108.   Merely two weeks prior to George Floyd's murder, a federal district court judge entered a final judgment in *Charmaine Chua, et al. v. City of Los Angeles, et al.*, 2:16-CV-00237 (C.D. Cal. 2020) against the City of Los Angeles in a class action settlement involving City's unconstitutional crowd control tactics during the 2014 protests following the Ferguson Grand Jury decision not to indict the officer who shot and killed Michael Brown.

## VI.

## PUNITIVE/EXEMPLARY DAMAGES ALLEGATIONS

### (Against individual Defendants CHIEF MICHAEL MOORE, JORGE RODRIGUEZ, JESUS GARCIA, and DOES 1-10)

109.   Each Defendants' conduct as alleged herein was done with reckless disregard for human life, oppression, and malice. Defendants, and each of them, were fully aware of the serious and demonstrable risk of serious bodily injury and death associated with deploying LLMs against peaceful protesters such as plaintiff, and that such risks are compounded when used to strike vulnerable and sensitive parts of Plaintiff's person with LLMs—such as his head. With full knowledge of such risks, and that the use of LLMs in such circumstances is unlawful, defendants proceeded to unlawfully fire LLMs at plaintiff and/or recommend, authorize, and ratify the use of LLMs against plaintiff, all of which resulted in plaintiff sustaining severe physical, mental and emotional harm.

110.   Defendants authorized and executed the unlawful deployment of LLMs with malice and with the specific intent to injure, debilitate, and incapacitate plaintiff physically and to deny, impede and constrain plaintiff's Constitutional rights and dissuade plaintiff from participating in future demonstrations.

111.   The Defendant officers, and each of them, acted with malice and oppression and with a conscious disregard for plaintiff's rights, making the individual defendants, including DOES 1-10, liable for punitive damages.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# VII.

## FIRST CLAIM FOR RELIEF

### Excessive Force

### Fourth & Fourteenth Amendments (42 U.S.C. § 1983)

### (Against all Defendants)

112.   Plaintiff realleges and incorporates herein by reference each of the preceding paragraphs, and all subsequent paragraphs of this Complaint.

113.   All of the acts of Defendants and the persons involved were done under color of state law.

114.   The acts of the Officer Defendants deprived Mr. Zuniga of rights, privileges, and immunities secured by the Constitution and laws of the United States, including but not limited to his rights under the Fourth Amendment of the United States Constitution, incorporated and made applicable to the states by the Fourteenth Amendment, by, among other things, subjecting him to unreasonable and excessive force.

115.   Each of the Officer Defendants was both personally involved and an integral participant in the violation of Mr. Zuniga's constitutional rights because each officer was aware of the unlawful actions of the other Officers, did not object to these violations of Mr. Zuniga's rights, and participated in the violations by performing police functions, including meaningful participation in the needless and unnecessary operation to escalate the encounter with Mr. Zuniga and use unjustified less-than-lethal force.

116.   With no lawful basis, reasonable suspicion, probable cause, or warrant, defendants intentionally and unlawfully seized plaintiff's persons by restraining Plaintiff with the use of LLMs, in a manner that resulted in Plaintiff shot in the head rendering him incapacitated and unable to leave. Defendants could not have reasonably believed that Plaintiff had committed or was about to commit any crime or public offense, particularly since plaintiff was unarmed, non-violent, and engaged

in lawful activity when he was shot in the head by the LAPD Officers indiscriminate deployment of LLM weapons at a crowd.

117.   With no lawful basis, reasonable suspicion, probable cause, or warrant, defendants used excessive a force on Plaintiff by unjustifiably firing LLMs at Plaintiff and striking Plaintiff in the head, causing severe physical injury when there was no reason to so restrain Plaintiff. Plaintiff's injuries resulting from the LAPD Officers firing LLMs indiscriminately at a crowd were known consequences from this type of abusive police behavior.

118.   Defendants knew or should have known that using excessive force against Plaintiff in this manner and detaining Plaintiff without reasonable suspicion or probable cause was a clearly established violation of the Fourth Amendment at the time of the incident.

119.   As a direct and proximate result of defendants' unlawful conduct, plaintiff suffered severe physical injury, emotional distress, humiliation and is entitled to monetary damages.

120.   The conduct of Defendants DOES 1-10 was willful, wanton, malicious, and done with an evil motive and intent and a reckless disregard for the rights of the Plaintiff and therefore warrants the imposition of exemplary and punitive damages against each individual Defendant (but not the entity Defendant) in an amount adequate to punish the wrongdoers and deter future misconduct.

## VIII.

## SECOND CLAIM FOR RELIEF

### Failure to Intervene

### Fourth & Fourteenth Amendments (42 U.S.C. § 1983)

### (Against all Defendants)

121.   Plaintiff realleges and incorporates herein by reference each of the preceding paragraphs of this complaint, and any subsequent paragraphs.

122.    All of the acts of Defendants and the persons involved were done under color of state law.

123.    The acts of the Officer Defendants deprived Mr. Zuniga of rights, privileges, and immunities secured by the Constitution and laws of the United States, including but not limited to his rights under the Fourth Amendment of the United States Constitution, incorporated and made applicable to the states by the Fourteenth Amendment, by, among other things, failing to intervene in the unlawful actions of other officers, including pointing their weapons at Mr. Zuniga and shooting him in the head with LLMs without justification. Plaintiff's injuries resulting from the LAPD Officers firing LLMs indiscriminately at a crowd were known consequences from this type of abusive police behavior.

124.    Each of the Officer Defendants was both personally involved and an integral participant in the violation of Mr. Zuniga's constitutional rights because each officer was aware of the unlawful actions of the other Officers, did not object to these violations of Mr. Zuniga's rights, and participated in the violations by performing police functions, including meaningful participation in the needless and unnecessary operation to escalate the encounter with Mr. Zuniga and use unjustified less-than-lethal force.

125.    As a direct and proximate result of Defendants' unlawful conduct, plaintiff suffered severe physical injury, emotional distress, humiliation and is entitled to monetary damages.

126.    The conduct of Defendants DOES 1-10 was willful, wanton, malicious, and done with an evil motive and intent and a reckless disregard for the rights of the Plaintiff and therefore warrants the imposition of exemplary and punitive damages against each individual Defendant (but not the entity Defendant) in an amount adequate to punish the wrongdoers and deter future misconduct.

///

///

**COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF; DEMAND FOR JURY TRIAL**

# IX.

## THIRD CLAIM FOR RELIEF

**Municipal Liability—Unconstitutional Policy, Practice, Custom**

**(42 U.S.C. § 1983)**

**(Against Defendants CITY OF LOS ANGELES, CHIEF MICHAEL MOORE and DOES 9 and 10)**

127.   Plaintiff realleges and incorporates herein by reference each of the preceding paragraphs of this complaint, and any subsequent paragraphs.

128.   As described above, the acts of Defendants DOES 1-8 deprived Plaintiff David Zuniga of his rights under the United States Constitution.

129.   All of the acts of Defendants and the persons involved were done under color of state law.

130.   The individual Defendants acted pursuant to expressly adopted official policies or longstanding practices or customs of Defendants CITY OF LOS ANGELES, CHIEF MICHAEL MOORE and DOES 9 and 10.

131.   Based on the aforementioned facts, Defendants CITY OF LOS ANGELES, CHIEF MICHAEL MOORE and DOES 9 and 10 as policymakers and supervisors maintained the following unconstitutional customs, practices, and policies:

    a.   Using excessive force, including excessive "less lethal" force in crowd control situations including but not limited to engaging with peacefully protesting individuals;

    b.   Providing inadequate training regarding the use of "less lethal" force in crowd control situations, including during encounters with individuals who are peacefully protesting;

    c.   Employing and retaining as Officers and other personnel, including Defendants DOES 1-8, CITY OF LOS ANGELES, CHIEF MICHAEL MOORE and DOES 9 and 10 at all times

31

material herein, knew or reasonably should have known had
dangerous propensities for abusing their authority and for
mistreating citizens by failing to follow written LAPD policies
and for using excessive force;

d.   Inadequately supervising, training, controlling, assigning, and
disciplining LAPD officers including Defendants DOES 1-8,
CITY OF LOS ANGELES, CHIEF MICHAEL MOORE and
DOES 9 and 10 each knew, or in the exercise of reasonable care,
should have known had the aforementioned propensities and
character traits;

e.   Maintaining grossly inadequate procedures for reporting,
supervising, investigating, reviewing, and disciplining and
controlling the intentional misconduct by LAPD Officers
including Defendants DOES 1-8;

f.   Failing to adequately discipline LAPD Officers, including
Defendants DOES 1-8, for the above-referenced categories of
misconduct, including "slaps on the wrist," discipline that is so
slight as to be out of proportion to the magnitude of the
misconduct, and other inadequate discipline that is tantamount to
encouraging misconduct;

g.   Announcing that unjustified uses of force are "within policy,"
including uses of force later determined in court to be
unconstitutional;

h.   Refusing to discipline, terminate, or retrain the Officers involved,
even where uses of force were determined in court to be
unconstitutional and where Officers commit repeated
constitutional violations;

**COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF; DEMAND FOR JURY TRIAL**

      i.      Encouraging, accommodating, or facilitating a "blue code of silence," "blue shield," "blue wall," "blue curtain," "blue veil," or simple "code of silence," pursuant to which Officers do not report other Officers' errors, misconduct or crimes. Pursuant to this code of silence, if questioned about an incident of misconduct involving another officer, while following the code, the officer being questioned will claim ignorance of the other Officers' wrongdoing;

      j.      Maintaining a policy of inaction and an attitude of indifference towards soaring numbers of police uses of force, including by failing to discipline, retrain, investigate, terminate, and recommend Officers for criminal prosecution who participate in using excessive force against unarmed people;

      k.      Covering up police misconduct and refusing to release information about police misconduct to the public even when required to do so by law. These customs and practices by Defendants CITY OF LOS ANGELES, CHIEF MICHAEL MOORE and DOES 9 and 10 were condoned by said Defendants in deliberate indifference to the safety and rights of its civilians, including Plaintiff.

      l.      Failing to follow or enforce compliance by Officers with the LAPD's own policies.

      m.      Failing to follow or enforce compliance by Officers with national law enforcement training and standards.

132.   Defendants CITY OF LOS ANGELES, CHIEF MICHAEL MOORE and DOES 9 and 10 together with various other officials, whether named or unnamed, had either actual or constructive knowledge of the different policies, practices, and customs alleged in the paragraphs above. Despite having knowledge as

1   stated above, these Defendants condoned, tolerated and through actions and inactions

2   ratified such policies. Said Defendants also acted with deliberate indifference to both

3   the foreseeable effects and consequences of these policies and to the constitutional

4   rights of Plaintiff, and other individuals similarly situated.

5         133.   By perpetuating, sanctioning, tolerating, and ratifying the outrageous

6   conduct and other wrongful acts, Defendants CITY OF LOS ANGELES, CHIEF

7   MICHAEL MOORE and DOES 9 and 10 acted with an intentional, reckless, callous

8   disregard for the well-being of Mr. Zuniga and his constitutional as well as human

9   rights. Furthermore, the policies, practices, and customs implemented, maintained,

10  and still tolerated by Defendants CITY OF LOS ANGELES, CHIEF MICHAEL

11  MOORE and DOES 9 and 10 were affirmatively linked to and were a significantly

12  influential and moving force behind the injuries of Mr. Zuniga.

13        134.   As a direct and proximate result of the aforementioned acts or omissions

14  of Defendants, Mr. Zuniga sustained and incurred damages including pain, suffering,

15  and emotional injury.

16        135.   The conduct of Defendants CITY OF LOS ANGELES, CHIEF

17  MICHAEL MOORE and DOES 9 and 10 was willful, wanton, malicious, and done

18  with an evil motive and intent and a reckless disregard for the rights of the Plaintiff

19  and therefore warrants the imposition of exemplary and punitive damages against

20  each individual Defendant (but not the entity Defendant) in an amount adequate to

21  punish the wrongdoers and deter future misconduct.

22                                        **X.**

23                        **FOURTH CLAIM FOR RELIEF**

24          **Municipal Liability—Ratification (42 U.S.C. § 1983)**

25   **(Against Defendants CITY OF LOS ANGELES, CHIEF MICHAEL MOORE,**

26                          **and DOES 9 and 10)**

27        136.   Plaintiff realleges and incorporates herein by reference each of the

28  preceding paragraphs of this complaint, and any subsequent paragraphs.

137.   As described above, the acts of Defendants DOES 1-8 deprived Plaintiff David Zuniga of his rights under the United States Constitution.

138.   All of the acts of Defendants and the persons involved were done under color of state law.

139.   Upon information and belief, the Defendants CITY OF LOS ANGELES, CHIEF MICHAEL MOORE and DOES 9 and 10, as final policymakers, acting under color of law, who had final policymaking authority concerning the acts of Defendants DOES 1-8 ratified the individual Defendants' acts and the bases for them. Upon information and belief, the final policymakers knew of and specifically approved of the individual Defendants' acts and found them to be justified and within policy.

140.   Upon information and belief, the Defendants CITY OF LOS ANGELES, CHIEF MICHAEL MOORE and DOES 9 and 10 as final policymakers, acting under color of law, have a history of ratifying unreasonable uses of force, including unreasonable less than lethal force.

141.   As a direct and proximate result of the aforementioned acts or omissions of Defendants, Mr. Zuniga sustained and incurred damages including pain, suffering, and emotional injury.

142.   The conduct of Defendants CITY OF LOS ANGELES, CHIEF MICHAEL MOORE and DOES 9 and 10 was willful, wanton, malicious, and done with an evil motive and intent and a reckless disregard for the rights of the Plaintiff and therefore warrants the imposition of exemplary and punitive damages against each individual Defendant (but not the entity Defendant) in an amount adequate to punish the wrongdoers and deter future misconduct.

///
///
///
///
///

# XI.

## <u>FIFTH CLAIM FOR RELIEF</u>

**Municipal Liability— Failure to Train, Supervise, Discipline, or Correct**

**(42 U.S.C. § 1983)**

**(Against Defendants CITY OF LOS ANGELES, CHIEF MICHAEL MOORE, and DOES 9 and 10)**

143.   Plaintiff realleges and incorporates herein by reference each of the preceding paragraphs of this complaint, and any subsequent paragraphs.

144.   As described above, the acts of Defendants DOES 1-8 deprived Plaintiff David Zuniga of his rights under the United States Constitution.

145.   All of the acts of Defendants and the persons involved were done under color of state law.

146.   The individual Defendants acted pursuant to expressly adopted official policies or longstanding practices or customs of Defendants CITY OF LOS ANGELES, CHIEF MICHAEL MOORE and DOES 9 and 10.

147.   On information and belief, Defendants CITY OF LOS ANGELES, CHIEF MICHAEL MOORE and DOES 9 and 10, acting under color of law, failed to properly and adequately train DOES 1-8, including but not limited to, with regard to the use of physical force and less than lethal force.

148.   In addition, the training policies of the City of Los Angeles were not adequate to train its officers to handle the usual and recurring situations with which they must deal, including but not limited to encounters with individuals who are peacefully exercising their First Amendment rights. The City of Los Angeles failed to adequately train its officers on public order policing, using the LLMs in crowd control situations, and isolating and removing small groups of violent or criminal individuals within a larger group of peaceful protestors, and failed to adequately supervise, direct, and/or coordinate its officers' deployment of the LLMs during the protests.

36

149.   The City of Los Angeles knew that its failure to adequately train its officers on public order policing, using the LLMs in crowd control situations, and isolating and removing small groups of violent or criminal individuals within a larger group of peaceful protestors made it highly predictable that its officers would engage in conduct that would deprive persons such as Mr. Zuniga of their rights. The City of Los Angeles knew that its failure to adequately supervise, direct, and/or coordinate its officers' deployment of LLMs made it highly predictable that its officers would engage in conduct that would deprive persons such as Mr. Zuniga of their rights. The City of Los Angeles was thus deliberately indifferent to the obvious consequences of its failure to train its officers adequately.

150.   Properly trained officers are trained to facilitate peaceful protestors' exercise of their First Amendment rights.

151.   Properly trained officers are trained to use less than lethal force only in response to someone violently resisting arrest or who poses an immediate threat of violence or physical harm. Defendant DOES 1-8 used such force against Mr. Zuniga even though he was not violently resisting arrest and posed no immediate threat of violence or physical harm to the Officers or anyone else.

152.   Defendants CITY OF LOS ANGELES, CHIEF MICHAEL MOORE and DOES 9 and 10 furthermore failed to enforce compliance by LAPD Officers with national law enforcement training and standards.

153.   Defendants CITY OF LOS ANGELES, CHIEF MICHAEL MOORE and DOES 9 and 10 were deliberately indifferent to the obvious consequences of its failure to train their Officers adequately. They knew that the failure to adequately train their Officers made it highly predictable that their Officers would engage in conduct that would deprive persons of their constitutional rights.

154.   The failure of Defendants CITY OF LOS ANGELES, CHIEF MICHAEL MOORE and DOES 9 and 10 to provide adequate training regarding, inter alia, the use of 40mm in crowd control situations, resulted in the wrongful uses

of force against Mr. Zuniga. The failure of Defendants CITY OF LOS ANGELES, CHIEF MICHAEL MOORE and DOES 9 and 10 to provide adequate training caused the deprivation of Mr. Zuniga's rights by Defendants DOES 1-8; that is, Defendants' failure to train is so closely related to the deprivation of Mr. Zuniga's rights as to the be moving force that caused the ultimate injury.

155.   As a direct and proximate result of the aforementioned acts or omissions of Defendants, Mr. Zuniga sustained and incurred damages including pain, suffering, and emotional injury.

156.   The conduct of Defendants CITY OF LOS ANGELES, CHIEF MICHAEL MOORE and DOES 9 and 10 was willful, wanton, malicious, and done with an evil motive and intent and a reckless disregard for the rights of Mr. Zuniga and therefore warrants the imposition of exemplary and punitive damages against each individual Defendant (but not the entity Defendant) in an amount adequate to punish the wrongdoers and deter future misconduct.

## XII.

## SEVENTH CLAIM FOR RELIEF

### Declaratory Relief (28 U.S.C § 2201)

### (Against All Defendants)

157.   Plaintiff realleges and incorporates herein by reference each of the preceding paragraphs of this complaint, and any subsequent paragraphs.

158.   There is an actual controversy between Plaintiff and Defendants concerning their respective rights and duties in that Plaintiff contends that the acts of Defendants, as described herein, are in violation of federal law, and Defendants contend in all aspects to the contrary.

159.   Plaintiff is entitled to a legal declaration of his rights and Defendants' obligations under the applicable laws as alleged in this Complaint.

///

///

**COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF; DEMAND FOR JURY TRIAL**

# XIII.

## **REQUEST FOR RELIEF**

Wherefore, plaintiff respectfully requests that the Court enter a judgment as follows:

A.    A declaratory judgment that defendants' conduct detailed herein was a violation of plaintiffs' rights under the Constitutions and laws of the United States and California;

B.    To the extent that the Court finds that defendants' conduct was authorized by custom, policy, or practice, and/or the inadequate training, supervision, instruction and discipline, a declaratory judgment that those customs, policies, or practices, and/or the inadequate trainings, supervisions, REQUEST FOR RELIEF instructions and disciplines are unconstitutional under the Fourth, and Fourteenth Amendments to the United States Constitution, and the analogous provisions of the California Constitution;

C.    An award of past and future economic damages against all defendants for the harms sustained by plaintiff in an amount to be determined according to proof at the time of trial;

D.    An award of general damages against defendants, and each of them, for the physical, mental and emotional damages, past and future, according to proof at the time of trial;

E.    An award of punitive and exemplary damages against the individual defendants, including Defendants MICHAEL MOORE, JORGE RODRIGUEZ, JESUS GARCIA, and DOES 1 through 10, in an amount to be determined according to proof at the time of trial;

F.    An award of attorneys' fees pursuant to 42 U.S.C. §§ 1983, 2986, 1988, 12205, and any other applicable provisions, and

**COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF; DEMAND FOR JURY TRIAL**

G.   Costs of suit, pre and post-judgment interest as permitted by law; and any such other relief as the Court may deem just and proper.

Dated: May 27, 2022

GASTÉLUM LAW, APC

By: _Denisse O. Gastélum_

DENISSE O. GASTÉLUM

Attorneys for Plaintiff,
DAVID ZUNIGA

1

## DEMAND FOR JURY TRIAL

2      Plaintiff David Zuniga hereby makes a demand for a jury trial in this action.

3

4    Dated: May 27, 2022                      GASTÉLUM LAW, APC

5

6                                            By: _____
                                                  DENISSE  O.  GASTÉLUM
7                                            Attorneys for Plaintiff,
                                             DAVID ZUNIGA
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF; DEMAND FOR JURY TRIAL**