Denisse O. Gastélum, SBN 282771
**GASTÉLUM LAW, APC**
3767 Worsham Ave.,
Long Beach, CA 90808
Tel: (213) 340-6112
Fax: (213) 402-8622
Email: dgastelum@gastelumfirm.com

Christian Contreras, SBN 330269
**LAW OFFICES OF CHRISTIAN CONTRERAS**
**PROFESSIONAL LAW CORPORATION**
360 E. 2nd St., 8th Floor
Los Angeles, California 90012
Tel: (323) 435-8000
Fax: (323) 597-0101
Email: CC@Contreras-Law.com

Attorneys for Plaintiff,
DAVID ZUNIGA

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID ZUNIGA, an individual,<br><br>               Plaintiff,<br><br>vs.<br><br>CITY OF LOS ANGELES; CHIEF MICHAEL MOORE; JORGE RODRIGUEZ; DANIEL BUNCH; MIGUEL ZENDEJAS; AARON GREEN; JESUS GARCIA; GREGORY SAYERS; and DOES 1 to 10,<br><br>               Defendants. | **CASE NO. 2:22-cv-03665-CBM-AS**<br>*[Assigned to the Hon. Consuelo B. Marshall, Courtroom 8B]*<br><br>**SECOND AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF**<br><br>1. **Excessive Force (42 U.S.C. § 1983; 4th and 14th Amendments)**<br>2. **Failure to Intervene (42 U.S.C. § 1983; 4th and 14th Amendments)**<br>3. **Municipal Liability—Unconstitutional Policy, Practice, or Custom (42 U.S.C. § 1983)**<br>4. **Municipal Liability—Ratification (42 U.S.C. § 1983)**<br>5. **Municipal Liability—Failure to Train, Supervise, Discipline, or Correct (42 U.S.C. § 1983)**<br>6. **Supervisory Liability (42 U.S.C. § 1983; 4th and 14th Amendments)**<br>7. **Declaratory Relief (28 U.S.C. § 2201)**<br>8. **Violation of Bane Act (Cal. Civ. Code § 52.1)**<br>9. **Assault**<br>10. **Battery**<br>11. **Negligence**<br><br>**JURY TRIAL DEMAND** |

# I.

## INTRODUCTION

1.     This action arises out of the unlawful use of force against Plaintiff David Zuniga during a peaceful protest at or near the intersection of Temple Street and Spring Street near City Hall of the City of Los Angeles on Friday, May 29, 2020. Plaintiff was present in the vicinity near a demonstration organized, in part, by Black Lives Matter Los Angeles to decry ongoing police violence perpetuated against communities of color, particularly Black people, across the United States.

2.     The peaceful exercise of freedom of speech and assembly on the evening of May 29, 2020 turned into a violent nightmare due to the escalatory and dangerous crowd control tactics employed by the City of Los Angeles—through the Los Angeles Police Department and its personnel Chief Michel Moore, Deputy Chief Jorge Rodriguez, Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers and LAPD Officers DOES 1 through 10—resulting in Plaintiff suffering severe physical injuries following unprovoked use of so-called "less lethal" projectiles by law enforcement personnel.

3.     Defendants' improper and unlawful crowd-control tactics violated Plaintiff's rights under the U.S. and California Constitutions, as well as Plaintiff's statutory and common law rights. Accordingly, this lawsuit seeks to hold Defendants, and each of them, accountable for Plaintiff's life-threatening injuries and to put an end to each Defendants' unconstitutional conduct.

# II.

## JURISDICTION AND VENUE

4.     This case is brought pursuant to 42 U.S.C. §§ 1983. Jurisdiction is conferred on this Court based upon 28 U.S.C. §§ 1331 and 1343.

5.     This Court has the authority to grant the requested declaratory relief pursuant to 28 U.S.C. §§ 2201, as well as Federal Rules of Civil Procedure 57, including pursuant to the Court's inherent equitable powers.

1       6.     Venue is proper within the Central District of California pursuant to 28

2  U.S.C. § 1391(b)(1) and (2) because all Defendants reside within this district and the

3  events and omissions giving rise to Plaintiff's claims occurred within this district.

**III.**

**PARTIES**

7.     Plaintiff DAVID ZUNIGA (hereinafter referred to as "Plaintiff" and

"Mr. Zuniga") was, at all relevant times, a 50-year-old monolingual Spanish-speaking

Angeleno.  Plaintiff is, and at all times material hereto was, a resident of Los Angeles

County.

8.     Defendant City Of Los Angeles (hereinafter referred to as "City") is a

municipal corporation duly organized and existing under the Constitution and laws of

the State of California. The Los Angeles Police Department ("LAPD") is a local

government entity and an agency of the City, and all actions of the LAPD are the

legal responsibility of the City. The City is charged by law with the administration

and operation of the LAPD, including the employment, control, supervision,

discipline, training, and practices of LAPD's personnel and employees, and with the

formulation of its policies, practices, and customs of LAPD's personnel and

employees. The City is sued in its own right on the basis of its policies, customs, and

practices which gave rise to Plaintiff's federal rights claims.

9.     Defendant Chief Michael Moore (hereinafter referred to as "Chief

Moore") is, and at all times material hereto was, the LAPD police chief and a

policymaker for his department.  Upon information and belief, Chief Moore was

present in person at the demonstration in Downtown Los Angeles on May 29, 2020

when Plaintiff sustained injuries following use of "less lethal" projectiles by law

enforcement.  He is sued in both his individual and official capacities.

10.     Defendant Jorge Rodriguez (hereinafter referred to as "Rodriguez") is, and

at all times material hereto was, a Deputy Chief with the LAPD and assigned to the

position of Incident Commander of the Central Bureau during the Floyd protests,

**SECOND AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF;
DEMAND FOR JURY TRIAL**

covering Downtown Los Angeles ("DTLA"), for "B" watch during which time Plaintiff sustained injuries following use of "less lethal" projectiles by law enforcement. Rodriguez participated in recommending and authorizing the deployment of "less lethal" munitions that injured Plaintiff. He is sued in both his individual and official capacities.

11.　　On information and belief, Defendants Miguel Zendejas, Aaron Green, and  Gregory Sayers are LAPD officers who needlessly accosted, assaulted, and, without any justification, injured Plaintiff David Zuniga (hereafter collectively, "Officer Defendants").

12.　　On information and belief, Defendants Daniel Bunch and Jesus Garcia (hereafter collectively, "Sergeant Defendants") are LAPD Unit Leaders who ordered and participated in the force used by Defendants Miguel Zendejas, Aaron Green, and Gregory Sayers.

13.　　At all relevant times, Defendant City was the employer of Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers. At the time of the incident, Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers were acting under color of law within the course and scope of their duties as employees for the LAPD. Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers were acting with the complete authority and ratification of their principal, Defendant City.

14.　　At all relevant times, DOES 7-10 were managerial, supervisorial, training, and/or policymaking employees of Defendant City. At the time of the incident, DOES 7-10 were acting under color of law within the course and scope of their duties as employees for the LAPD and/or the City. They had supervisorial authority over DOES 1-6, and the Officers and employees of the LAPD. DOES 7-10 were acting with the complete authority and ratification of their principal, Defendant City.

15.　　Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers are sued in both their individual and official capacities.

16.     On information and belief, Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers were and still are residents of the County of Los Angeles, California.

17.     Furthermore, the identities, capacities, and/or nature of involvement of the defendants sued as DOES 1 through 10 are presently unknown to plaintiff who therefore sues these defendants by fictitious names. Plaintiff is informed, believes, and thereupon alleges that DOES 1 through 10 include individual law enforcement personnel employed by the LAPD and LASD that were involved in some manner and are legally responsible for the wrongful acts and conduct alleged herein. Plaintiff will amend this complaint to substitute the Doe defendants' true names and capacities when they have been ascertained. Plaintiff is informed, believes, and thereupon alleges that each Doe defendant is a resident of California.

18.     Each of the defendants, including the Doe defendants, caused, and is responsible for, the unlawful conduct and resulting injuries suffered by plaintiff by, among other things, personally participating in the unlawful conduct, acting jointly, or conspiring with others who did so; by ordering, authorizing, acquiescing in, or setting in motion policies, plans, or actions that led to the unlawful conduct, by failing to take action to prevent the unlawful conduct; by failing and refusing to initiate and maintain adequate training and supervision; by failing to enact policies to address the constitutional rights of protesters despite the obvious need for such a policy; and by ratifying the unlawful conduct that occurred by agents and officers under their direction and control, including failing to take remedial or disciplinary action.

19.     Plaintiff is informed, believes, and thereupon alleges that, at all times relevant hereto, defendants, and each of them, acted as the agents, servants, and employees of each of the other defendants.

20.     In doing each of the acts and/or omissions alleged herein, defendants, and each of them, acted within the course and scope of their employment.

21.     In doing each of the acts and/or omissions alleged herein, defendants, and each of them, acted under color of authority and/or under the color of law.

**IV.**

**FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

**A. The Violent Response of Law Enforcement to Peaceful Protests.**

22.     The recent brutal murders of George Floyd, Breonna Taylor and Ahmaud Arbery—the culmination of historical police oppression of the Black community—brought the United States to a crossroads.

23.     Upon the passing of George Floyd, residents of Minneapolis (where Mr. Floyd was murdered) took to the streets to denounce systemic racism and the history of violence which has targeted Black lives. Soon, hundreds of thousands of demonstrators across the country—in cities and towns large and small—joined Minneapolis in demanding immediate change, including the residents of Los Angeles County where, over the past 20 years, it is estimated that law enforcement has killed about three to four people each month.[1]

24.     The City is already a subject of numerous lawsuits challenging the unlawful use of force and detention against unarmed protesters.[2] Much of the complaints alleging excessive force have centered on the deployment of so called "less lethal munitions" ("LLM") and weapons, including such things as rubber bullets, batons, tasers, and pepper spray.

25.     "Less lethal" or "non-lethal" weapons are a deceptively monikered group of arms utilized by law enforcement for crowd control ostensibly without the intention to cause death. Although such weapons are less likely to kill the target than

[1] *Los Angeles Police Killings Database* (LA TIMES, June 9, 2020), available at: https://www.latimes.com/projects/los-angeles-police-killings-database/.
[2] *See, e.g., LAPD Sued by Black Lives Matter-LA in Federal Court Over Mass Detention* (LA DAILY NEWS, June 5, 2020), available at: https://www.dailynews.com/2020/06/05/lapd-sued-by-black-lives-matter-la-in-federal-court-over-mass-detention/ ; *Peaceful Protestor Hit by LAPD Vehicle Files Government Claim* (PR Newswire, June 5, 2020), available at: https://www.prnewswire.com/news-releases/peaceful-protestor-hit-by-lapd-vehicle-files-government-claim-301071482.html

6

are conventional weapons such as firearms that shoot bullets, their use and misuse can result in serious and permanent bodily harm, and have also caused death.[3]

26.    This excessive and unlawful use of force against peaceful demonstrators is a deliberate, first-line tactic which is embedded in the institutional culture of the City.

27.    "[I]n most cases killing is just not that big of a deal"[4] is a cavalier sentiment expressed by Dave Grossman while instructing law enforcement personnel in "Killology", a neologism coined by Grossman to describe "the scholarly study of the destructive act".[5] A former Army Ranger, Grossman prides himself as an authority on aggression and devotes his time to traveling throughout the country teaching law enforcement personnel on how to become more effective killers. His books on the subject are required reading at the FBI academy and police academies across the U.S. [6] In essence, Grossman's philosophy—expounded using fear mongering imagery to characterize those killed by law enforcement as "terrorists" and "gang bangers"— advocates a "warrior" mentality amongst law enforcement that does not hesitate to use deadly force or regret its consequences.[7] And, not without correlative results. The officer who murdered Philando Castile in 2016 had taken a class with Grossman just two years before the shooting.[8]

---

[3] *See* United Nations Public Order Management, *Less Than Lethal Weapons* (UN Peacekeeping PDT Standards for Formed Police Units, 1st Edn. 2015), available at: http://repository.un.org/bitstream/handle/11176/387390/Less%20Than%20Lethal%20Weapons.pdf#page=7 . LLMs include rubber bullets; rubber buckshot; soft polymer rounds; wax bullets; plastic bullets; beanbag rounds; sponge grenades; ring airfoil projectiles (both kinetic and tear gas projectiles); and rubber bullets with electroshock effect (e.g. Taser XREP rounds).

[4] "*Enjoy the Killing*" Do Not Resist at 0:20 (YOUTUBE, March 1, 2019), available at: https://www.youtube.com/watch?v=PwEYhIX4cbM&t=22s .

[5] *See* https://www.grossmanacademy.com/about-the-colonel .

[6] *See "Are You Prepared to Kill Somebody?" A Day With One of America's Most Popular Police Trainers* (MOTHER JONES, March, 2017), available at: https://www.motherjones.com/politics/2017/02/dave-grossman-training-police-militarization/

[7] Kelly McLaughlin, *One of America's Most Popular Police Trainers is Teaching Officers How to Kill* (INSIDER, June 2, 2020), available at: https://www.insider.com/bulletproof-dave-grossman-police-trainer-teaching-officers-how-to-kill-2020-6

[8] *Id.*

**SECOND AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF; DEMAND FOR JURY TRIAL**

28.     The City enrolled some 600 LAPD personnel in one of Grossman's "trainings" where, reportedly, a LAPD detective informed Grossman that he was the first individual in twenty years to tell her: "it's ok. That [sic] not feel bad about killing that guy." [9] Upon information and belief, the City—through the LAPD—has hosted Grossman's trainings for its law enforcement personnel on numerous occasions over the years.

29.     In May 2009, the California Homeland Security Response Conference, held in Palm Springs, California and chaired by LAPD Deputy Chief Michael Downing and including LASD Detective Don Lord; LAPD Officer Jim Buck; and Jon A. Winstanley of the LAPD Counter Terrorism & Criminal Intelligence Bureau as part of its Steering Committee, hosted training sessions by Grossman titled "Terrorism and Human Aggression" and "Bullet Proof Mind" for the City's law enforcement personnel.[10] This training was organized, supervised, and ratified by the City.

30.     Grossman's dangerous pseudo-scientific pontifications—which have been widely disseminated by the City to its law enforcement personnel—are part and parcel of a larger industry of militarized and fear-based law enforcement educators such as psychologist William Lewinski, whose work has been roundly rejected by the scientific community.[11]

31.     This "shoot first" mentality is endemic within the LAPD and perpetuated by the policies, practices, and customs of the City, directly contributing to the disastrous and tragic outcomes when the LAPD are deployed in response to peaceful protesters—such as plaintiff—exercising their Constitutional rights.

---

[9] "*Enjoy the Killing*" Do Not Resist at 1:12 (YOUTUBE, March 1, 2019), available at: https://www.youtube.com/watch?v=PwEYhIX4cbM&t=22s .

[10] CFED, California Homeland Security Response Conference (May 13-2009), Conference Agenda at 3, 6, 7, available at: http://lib.store.yahoo.net/lib/yhst-129183456818554/cfed-west.pdf .

[11] Zachary Siegel, *Is the Psychology of Deadly Force Ready for the Courts?* (SCIENTIFIC AMERICAN, December 20, 2018), available at: https://www.scientificamerican.com/article/is-the-psychology-of-deadly-force-ready-for-the-courts/

32.     The City has a long, troubled history of employing unlawful suppression tactics in response to protests. [12] Over the course of the last several decades, the City has been sued repeatedly for much of the same conduct challenged herein, including excessive force with rubber bullets. For example, on May 1, 2007, the LAPD engaged in a substantially similar use of the same type of unlawful force complained of herein against peaceful marchers in the MacArthur Park area of the City of Los Angeles, resulting in a subsequent class action lawsuit and Structural Relief Order being issued which set forth specific grounds for the use of LLMs when the LAPD engages in crowd control. *Multi-Ethnic Worker Organizing Network v. City of Los Angeles* (C.D. Ca. CV 07-3072 AHM). As discussed below, the City utterly failed to follow the mandates of the Structural Relief Order in the instant matter.

**B. Plaintiff David Zuniga Is Shot in the Head By LAPD Officers Who Fired Less Lethal Munitions Indiscriminately at the Crowd.**

33.     On the evening of May 29, 2020, Plaintiff was present near a peaceful protest in Downtown Los Angeles at or about the intersection of Temple and Spring Streets, near City Hall.

34.     That evening, Defendant Rodriguez was assigned to the position of Incident Commander of the Central Bureau during the Floyd protests, covering Downtown Los Angeles, for "B" watch during which time Plaintiff sustained injuries following use of "less lethal" projectiles by law enforcement. Rodriguez participated in recommending and authorizing the deployment of "less lethal" munitions that injured Plaintiff.

35.     That evening, Defendants Daniel Bunch and Jesus Garcia were squad leaders of MFFs which formed the skirmish line in front of City Hall at 9:35 p.m. along Spring Street between Temple Street and 1st Street.

36.     Upon information and belief, Defendants Daniel Bunch and Jesus Garcia

---

[12] *See LAPD Violence Against George Floyd Protests Erodes A Decade of Reforms* (LA TIMES, June 14, 2020), available at: https://www.latimes.com/california/story/2020-06-14/lapd-protest-history-criticism-heavy-tactics

authorized the use of 37 mm and 40 mm less lethal munitions. Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers, member of MFF Squad Q140 and MFF Squad P650, kettled the crowd in the middle of Spring Street between Temple Street and 1st Street in front of City Hall where Plaintiff was present.

37. The decision to exercise unreasonable force by deploying LLMs against Plaintiff and the crowd of peaceful demonstrators was recommended and authorized by Chief Moore, Rodriguez, and DOES 7-10. The use of LLMs against protesters was authorized at or around 7 p.m. on May 29, 2020 and continued well beyond the time that Plaintiff was injured.

38. Defendants declared nearly all of Downtown Los Angeles an "unlawful assembly" and imposed an immediate curfew for the area. The curfew was announced on the LAPD and Mayor Garcetti Twitter accounts, and at Mayor Garcetti's press conference.

39. On Twitter, the LAPD wrote: "This [curfew order] is being made following repeated acts of violence and property damage. Residents should stay inside. Business should close. Those on the street are to leave the area."

40. This was inadequate notice as it is unlikely that all, most or even many of the 10 million residents of the City follow the LAPD on Twitter.

41. During that time, Plaintiff was at Grand Park near his home watching a movie on his phone. He did not hear the curfew order nor did he hear an order to disperse.

42. Between the evening hours of 8:30 p.m. and 9:00 p.m., Mr. Zuniga observed the police form a line and begin pushing the protestors toward City Hall. Approximately 100-200 people were assembled. The crowd moved in compliance with the police orders, but each time the demonstrators did so, they were met by other lines of police officers that blocked them.

43. As stated before, Defendants Daniel Bunch, Miguel Zendejas, Aaron

**SECOND AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF; DEMAND FOR JURY TRIAL**

Green, Jesus Garcia, and Gregory Sayers, formed a skirmish line in front of City Hall at 9:35 p.m. along Spring Street between Temple Street and 1st Street. Other LAPD officers were on Temple St. and on the north side of Spring St. thereby preventing Mr. Zuniga from leaving the area and effectively, trapping Mr. Zuniga directly in front of City Hall.

44.    At approximately 9:35 p.m., Mr. Zuniga observed an ever-increasing number of LAPD officers arrive and attired in riot gear, heavily armed and forming what appeared to be an impenetrable wall of officers stretching across a wide area encircling the protestors.



*[LAPD Ofcr. Organista bodycam footage from May 29, 2020 at 9:35 p.m. on Spring Street between Temple Street and First Street in front of City Hill. This image captures Mr. Zuniga standing in the middle of the street with other peaceful protestors seconds before the LAPD officers deployed LLM at the crowd striking Mr. Zuniga in the head.]*

45.    The demonstrators realized that they were being herded by the police into a confined space as a group and completely surrounded by officers. Mr. Zuniga and others asked to leave the demonstration but were refused by the officers at the scene.

46.    Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, and Gregory Sayers continued advancing towards the protesters and Mr. Zuniga.

47.    Suddenly and without warning, Plaintiff heard shots being fired. LAPD

SECOND AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF;
DEMAND FOR JURY TRIAL

officers, including Defendants, Miguel Zendejas, Aaron Green, and Gregory Sayers, fired LLMs indiscriminately at the crowd.

48.    Repeatedly and indiscriminately, Defendants, Miguel Zendejas, Aaron Green, and Gregory Sayers officers deployed less-lethal weapons, shooting what are only authorized as target specific into crowds of protestors, including protestors kettled by officers and at the back of protestors as they ran away from officers displaying and shooting at them.

49.    Plaintiff David Zuniga was shot in head by Defendants, Miguel Zendejas,



Aaron Green, and Gregory Sayers. Plaintiff felt immediate pain to his head. He began to bleed, fell to the ground, and lost consciousness temporarily.

50.    Through confusion and disorientation, Plaintiff begged for LAPD's aid and assistance but was completely ignored because the officers were continuing to advance on the crowd.

51.    Almost two hours later, at about 11:00 p.m., Plaintiff received emergency medical care and was transported to a nearby hospital.

*[This photograph was taken my emergency personnel two hours after Mr. Zuniga was struck in the head with LLMs. The paramedic had to dump a gallon of water on Mr. Zuniga's head to remove the blood which had covered his entire head and face.]*

52.    Plaintiff's injuries are still being evaluated by medical professionals. As a direct and proximate result of being shot by law enforcement personnel, Plaintiff suffered a serious heady injury and laceration to his head. As a further direct and proximate result, Plaintiff continues to experience, inter alia, hearing loss, a brain

SECOND AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF;
DEMAND FOR JURY TRIAL

injury, sensitivity to the scar, recurrent headaches, dizziness, nausea, and mental confusion, and further suffers from fear of crowds, fear of police, physical pain, mental suffering, loss of enjoyment of life, physical impairment, inconvenience, grief, anxiety, depression, and emotional distress.

53. Plaintiff's injuries resulting from the LAPD Officers firing LLMs indiscriminately at a crowd were known consequences from this type of abusive police behavior.

## V.

## FACTUAL ALLEGATIONS COMMON TO *MONELL* CAUSES OF ACTION

54. Based upon the principles established in *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), Defendants are liable for all injuries sustained by Plaintiff as set forth herein. The City has failed to train its officers in the constitutional responses to peaceful demonstrations, and its officers' actions were the result of custom, policy, or practice, inadequate supervision, instruction, and discipline. The City has condoned the Constitutional rights violations and abuses that are the subject of this action and have thereby encouraged and ratified such conduct.

55. The LAPD engaged in violations of law, as outlined above, by the use of indiscriminate and excessive and unreasonable force against Plaintiff. The excessive and unreasonable force inflicted upon Plaintiff by the LAPD occurred through the use of LLMs while Plaintiff was present near a peaceful demonstration on May 29, 2020.

56. Specifically, the Defendants Aaron Green, Jesus Garcia, and Gregory Sayers, as also ordered by Defendants Daniel Bunch and Jesus Garcia, fired LLMs at Plaintiff, thereby incapacitating Plaintiff and causing severe and permanent physical injuries. Upon information and belief, the use of LLMs by Defendants Aaron Green, Jesus Garcia, and Gregory Sayers was authorized by Defendants Daniel Bunch and Jesus Garcia in consultation with Rodriguez and ratified by Chief Moore.

57. The injuries to Plaintiff resulted from the LAPD's policies, both affirmative and deficient, and the LAPD's nearly total lack of adequate training on

the use of less lethal munitions. Department policy directs that: "The 40mm LLL shall not be used to target the head, neck, face, eyes, or spine unless lethal force is authorized. The minimum recommended deployment range for the 40mm LLL is five feet, while the effective deployment range is up to 110 feet. Officers should always consider weapon retention principles when deploying the 40mm LLL to prevent a subject/suspect from gaining control of the launcher."

58. As Chief of the LAPD, Chief Moore was fully knowledgeable and apprised of these actions and, upon information and belief, was present during the May 29 demonstration in Downtown Los Angeles, observing and directing the operation of his officers, without repudiating or stopping the actions of the LAPD officers, thereby ratifying them. Moreover, in his reports to the Police Commission and in other public statements, Chief Moore stated repeatedly that the actions of the LAPD officers were proper.

59. Chief Moore further delegated responsibility and authority to persons within his command staff to act as the final policy maker in determining the response to the May 29, 2020 assembly in Downtown Los Angeles, specifically at the site where Plaintiff was injured. The persons who made these decisions acted as the delegated policy maker for the City of Los Angeles on these issues.

60. Moreover, Chief Moore and his delegated command staff were at all relevant times aware that the use of unlawful or inadequate dispersal orders and LLMs—such as LLMs—to break up lawful protests, in particular, is a custom so ingrained in the marrow of the LAPD that it was critical for leadership to ensure that official policy was trained and implemented in a manner sufficient to address the custom to violate First Amendment rights in the specific ways identified in the *National Lawyers Guild* settlement agreement. The failure to take these necessary steps directly and proximately lead to the injuries suffered by plaintiff in the instant matter. This failure amounted to an "acquiescence in the constitutional deprivations of which [the] complaint is made" and deliberate indifference to the rights of persons

with whom the police come into contact, and constituted a conscious choice by the City not to properly train its law enforcement personnel on these issues.

61. In conjunction with Defendants' long history of protest-related constitutional violations as alleged in this Complaint, each Defendants' repeated unlawful acts on May 29, 2020 constitute a *de facto* policy, practice, and/or custom of violating protesters' constitutional rights, including the constitutional rights of plaintiff. Such policy, practice, and/or custom was the direct and proximate cause of plaintiff's injuries.

62. These violent law enforcement responses prompted several investigations into the LAPD's actions during the May-June 2020 protests:

**A. Chaleff After-Action Report**

63. On June 30, 2020, the Los Angeles City Council ("City Council") approved a motion directing the LAPD to prepare an After-Action Report reviewing the LAPD's actions during the May-June 2020 protests. The City Council requested that Gerald Chaleff, the author of LAPD's review of the 2007 May Day protests, lead the review. The LAPD ultimately decided to conduct its own after-action review.

64. Mr. Chaleff and his review team[13] prepared "An Independent Examination of the Los Angeles Police Department 2020 Protest Response," ("Chaleff's After-Action Report"), which was transmitted to the City Council on March 10, 2021.

65. The Chaleff After-Action Report found the LAPD's response to the May-June 2020 protests deficient in the following areas: (1) planning, (2) command and control, (3) public order policing, (4) less lethal tools, (5) mass arrests, (6) preparedness and training, and (7) wellness. The Report lists 67 findings across these six areas.

66. The "Planning Findings" include the following:

---

[13] Mr. Chaleff led a review team consisting of other retired LAPD officers and a law enforcement consultant.

a. "There was a lack of a unified message from City leaders to de-escalate the violence so that peaceful protestors could exercise their First Amendment rights."

b. "There was a lack of firm executive-level direction to the Department command officers to prepare and plan for potential widespread civil unrest and demonstrations which contributed to the problems cited throughout this report."

67. The "Public Order Policing Findings" include the following:

a. "There was a lack of training to properly prepare command officers for managing large crowds with the possibility of civil unrest and many command officers stated they did not feel confident in handling these incidents."

68. The "Less Lethal Tools Findings" include the following:

a. "The deployment of less lethal munitions was not always done at the direction of a supervisor or officer. In some instances, officers were directed to be in front of a skirmish line and left to deploy less lethal tools, including the 40 mm, with no direction or coordination."

b. "The Department's Use of Force Tactics directive authorizing the use of 40mm has no detailed guidance on use in public order policing situations."

c. "[T]he Review Team did not find the two hours of training to be sufficient given the skill level needed to deploy the 40mm in a chaotic public order policing environment."

d. "Officers are required to be trained one time on the 40mm system. Deploying the 40mm in public order policing situations requires recurring certification and training."

e. "The last training for the 40mm for officers, other than those

1  going through recruit training, was in 2018."

2  69.  The "Preparedness and Training Findings" include the following:

3  a.  "Annual, hands on training on public order policing for command

4      staff diminished over time resulting in many command staff in

5      2020 not being prepared for the civil unrest."

6  b.  "[A]dditional training and mentoring in crowd control tactics and

7      specific incident command system positions, such as incident

8      commander, operations chief, logistics, etc. are needed and should

9      be conducted on an annual basis."

10  c.  "Training on the 40mm system use during crowd control

11      situations was insufficient."

12  70.  The Chaleff After-Action Report issued 22 recommendations, which

13  include:

14  a.  "Undertake an extensive study of all less lethal munitions,

15      including the 40 mm round, to examine performance, consistent

16      velocity, potential for ricochets, influence of the plastic wrapping

17      or banding around the sponge projectile and other aspects of the

18      round. Included in that study should be any potential new

19      technology for use in public order policing operations."

20  b.  "Design and implement an inventory system to audit and track

21      the amount of less lethal munitions, including the 37mm and

22      40mm rounds, expended during any public order policing

23      incidents."

24  c.  "Update the use of force tactical directives to include more

25      detailed instruction regarding the use of less lethal tools in crowds

26      and the approval level required for the deployment of each the less

27      lethal."

28  d.  "Establish protocols that: (a) Only trained (certified) members of

17

Metropolitan Division or officers who receive consistent and
periodic instruction and certification in the 40mm system should
be allowed to deploy the 40mm during crowd control situations,
(b) Retain the use of the 40mm system for all other officers during
patrol duties and ensure annual retraining of weapon
manipulations during shotgun qualification, and (c) Mandate the
use of body worn video (when feasible) to record problem
behavior of individuals in the crowd when officers decide to use
the target specific 40mm in a crowd control situation."

68.     The Chaleff Report documented the lack of training on the use of less-
lethal munitions.  According to this report, the LAPD changed its training in 2017
and the revised presentation cut the course time by 50% or more.  From 2007 to 2009,
following the May Day 2000 police assault on peaceful demonstrators in MacArthur
Park with batons and less lethal munitions, the LAPD instituted a 10-hour Crowd
Management/Crowd Control course that all sworn personnel were required to attend.
This training diminished over the years until, by 2015, ongoing training was largely
eliminated.

69.     The Chaleff Report found the general training on crowd control to be
inadequate and also concluded the training on use of 40mm munitions to be
insufficient.  At the time of the Floyd protests in 2020, the training was a 2-hour
module on use of the 40mm, taking up half of the inadequate four-hour crowd control
block.

70.     According to the manufacturers specifications, the 40mm munition
travels at 325 feet per second.   LAPD policy sets a minimum distance of five feet
from the target and a maximum of 110 feet for the 40mm deployment. LAPD policy
restricts use of the 40 mm weapon and all less lethal force to situations where an
officer reasonably believes that a "suspect or subject is violently resisting arrest or
poses an immediate threat of violence or physical harm."  The policy specifically

prohibits targeting a person's head and upper torso unless lethal force is authorized. In a crowd situation, it may only be used as a target specific weapon and not to disperse a crowd.

71. At the time of the Floyd protests, training for patrol officers deploying 40mm weapons was primarily limited to the 2-hour block, with limited opportunity to actually shoot the weapon and then only at a static target. According to the Chaleff Report, in 2017, when the LAPD expanded use of the 40mm weapon for regular patrol officers, the LAPD determined that the two-hour component and one-time qualification was adequate.

72. The decision to limit training appears to be largely economic. The Chaleff Report noted the cost of each round at approximately $25, "making it too expensive to certify [requalify] the entire Department on a regular basis."

73. The Chaleff Report concluded that the one-time two-hour training on the 40mm was inadequate, especially when the weapons were deployed in "chaotic public order policing situations[,]".

74. The other munitions used by the LAPD during the Floyd protests were the 37mm launcher and the beanbag shotgun. The 37 mm weapon is non-target specific and only allowed to be skip-fired from a minimum of 15 feet and a maximum of 30 feet. With approval of the Incident Commander, it may be used for crowd control when a dispersal order was issued or there is an immediate threat of violence, ensure public safety and restore order." The use of the 37mm munition as a direct impact weapon requires approval of the Incident Commander. In this action, the LAPD gave blanket authorization to deploy the 37mm weapon without knowledge of the specific facts giving rise to a justified deployment.

75. The beanbag shotgun is permitted in crowd control situations as a target specific less-lethal option against a single individual. The restricted body impact zones for the beanbag are generally the same as for the 40mm weapon.

///

76.     The Chaleff Report concluded that most injuries from less-lethal weapons resulted from the 40mm weapons. Chaleff identified the pros and cons of the 40mm weapon in a crowd control situation.  On the one hand, the 40mm has a greater effective range which makes "precise, target -specific shots at distance possible, but also magnifies issues such as marksmanship (or lack thereof) and movement of the target," and concluded that "a greater level of training, marksmanship and competency is necessary" with the 40mm.

77.     More specifically, in viewing some of the video of these events, the Chaleff Report found "there were instances where officers quickly fired the 40mm rounds at distant targets which increase[d] the likelihood of hitting an unintended target."

**B.  NPF After-Action Report**

78.     In July 2020, the Los Angeles Board of Police Commissioners asked the National Police Foundation ("NPF") to conduct an after-action review assessment, and analysis of the LAPD's actions during the May-June 2020 protests. The Los Angeles Police Foundation funded the National Police Foundation's after-action review.

79.     The National Police Foundation's Report, "A Crisis of Trust: A National Police Foundation Report to the Los Angeles Board of Police Commissioners on the Los Angeles Police Department Response to First Amendment Assemblies and Protests Occurring May 27 – June 7, 2020" ("NPF After-Action Report) was released on April 9, 2021.

80.     The NPF After-Action Report lists 22 findings, which include:

     a.    LAPD's policies and practices "were inadequate to handle the disparate groups, or to identify leaders amongst the protesters and address the level of violence."

     b.    "Some LAPD personnel had not been provided contemporary training on crowd management, mobile field force, supervision,

de-escalation, or the use of less-lethal instruments prior to the First Amendment assemblies and demonstrations from May 27 through June 7, 2020. Many of the LAPD training bulletins, courses, and directives related to crowd management and control were outdated."

    c.    LAPD "do[es] not have one policy directing response specifically to large scale, fluid, city-wide civil unrest that turns violent or contains violence."

    d.    Communication "between the Chief, his command staff, bureau commanders and field supervisors, and line officers" was inconsistent and "created significant challenges regarding: (a) identifying a cogent operating philosophy; (b) determining operations during individual shifts, including when shifts started and ended; and, (c) establishing coordination and consistency between shifts." This "impacted every component of the LAPD response" to the protests. 82.

81.    The NPF's recommendations include:

    a.    "LAPD should synthesize the relevant provisions spread throughout the current Department and clearly establish guidelines for the coordination, facilitation, and management of First Amendment assemblies and protests."

    b.    "LAPD should review national and international best practices regarding the impact of police actions on First Amendment assembly and protest participants."

    c.    LAPD should "develop[] strategies, tactics, and Mobile Field Force teams to more effectively respond to these types of First Amendment assemblies and protests, which are becoming more frequent in the City and nationwide."

1        d.    "LAPD should consider developing an overarching 'response to
2              fluid dynamic protests and civil unrest' policy that provides for
3              the nuances of this type of event, incorporates critical thinking
4              skills and offers decision making models to guide at what points
5              uses of force and relevant tools are permitted to be used by LAPD
6              officers."

7    **C. LAPD Internal After-Action Report**

8    82.    LAPD's after-action report, "SAFE LA Civil Unrest 2020 After Action
9    Report," ("LAPD Internal After-Action Report") was released on April 9, 2021.

10   83.    According to the LAPD, officers deployed 11,305 rounds of "less-lethal
11   munitions" during the May-June protests, comprised of:

12       a.    4,377 37mm projectile rounds

13       b.    2,621 40mm projectile rounds

14       c.    4,307 beanbag shotgun rounds

15   84.    The LAPD's Internal After-Action Report list recommendations in
16   twenty- six areas of improvement. Some of these recommendations highlighted the
17   LAPD's inadequate command and control training and deficiencies regarding
18   communications and unity of command. 85. One specific recommendation is: "The
19   Department used a significant amount of less-lethal munitions to protect the City and
20   restore order. The Department should continue to research and seek best practices
21   related to the deployment of less-lethal munitions. This should include an
22   examination of the Department's current less-lethal capabilities and new available
23   technologies. A clear understanding regarding when to deploy less-lethal and the
24   level of approval necessary should be reiterated and clarified to avoid confusion.
25   When less-lethal is deployed, when available it should be used in conjunction with
26   BWV to capture the activity leading up to the decision to use less-lethal. Officers
27   trained in less-lethal should attend annual weapons manipulation training."

28   ///

85.     The LAPD Internal After-Action Report does not address the thousands of citizen complaints arising from these protests.

86.     Despite all evidence to contrary, Chief Moore stated that the "vast majority of [LAPD] personnel performed admirably" during the protests in his letter to the Police Commission accompanying the LAPD Internal After-Action Report.

**D. SAFE LA Task Force**

87.     The SAFE LA Task Force was established to handle personnel complaints arising out of the May-June 2020 protests.

88.     On April 9, 2021, the Board of Police Commissioners received the "SAFE LA Task Force Update Report" from Chief Moore.

89.     According to the Report, the Office of the Inspector General received 2,850 personnel complaints related to the protests. The SAFE LA Task Force initiated 210 complaint investigations, of which 73 were related to excessive use of force. As of April 9, 2021, 33 of these investigations were reviewed and no allegations for unauthorized force were sustained.

**E. LAPD Officer of Inspector General**

90.     In a 2022 report, the LAPD Office of the Inspector General ("OIG") reported that "crowd control situations are often the source of substantial numbers of significant uses of force by Department officers, including deployment of less-lethal weapons and munitions."  The OIG illustrated this point by citing to the 2020 Floyd protests, where "officers fired the 40mm Less-Lethal Launcher 2,621 times during the 'SAFE LA' crowd control incidents that occurred in mid-2020, and they fired the beanbag shotgun 4,307 times.  Additionally, officers fired the 37mm Less Lethal Launcher, which is only authorized for use in crowd control situations, a reported total of 4,377 times."[14]

///

---

[14] LAPD Safe LA Civil Unrest 2020 After Action Report, p.74, available at:
https://lapdonlinestrgeacc.blob.core.usgovcloudapi.net/lapdonlinemedia/2021/11/BPC_21-066.pdf

91.     Using the numbers in the preceding paragraph, the LAPD fired a total of 11,305 munitions at the Floyd protestors.  Plaintiff's injuries, as well as the widespread injuries suffered by protestors and innocent bystanders during the May-June protests, which were caused by the deployment of the less lethal weapons, resulted from, most fundamentally, the grossly inadequate training on this highly perishable skill.  The lack of practice with these weapons – "less lethal," not "non-lethal" – and the blanket advance authorization to deploy these weapons, regardless of whether a specific situation was justified according to LAPD policy, resulted in identifiable and serious injuries to dozens of persons during the Floyd protests, including Plaintiff.

**F.  LAPD's History of Lawsuits Resulting from Excessive Force at Protests**

92.     The City has failed to train their officers in the appropriate constitutional responses to peaceful demonstrations. Specifically, Defendants have failed to provide adequate training for: 1) proper crowd control and dispersal methods; and 2) proper use of LLMs in crowd control tactics.

93.     Upon information and belief, the City maintains policies, including the routine use of tactics, that are escalatory by nature, including the use of riot gear and LLMs at demonstrations and protests for crowd control purposes, thereby placing demonstrators such as plaintiff at risk of serious injury. The City's escalatory and dangerous policies and practices include, *inter alia*, hosting training for their officers in "killology"—which, as described above, advocates the free, and often indiscriminate, use of deadly force by law enforcement.

94.     The rights of Plaintiff that were violated in the instant matter were clearly established long before the incident on May 29, 2020.

95.     Upon information and belief, the City participates in the California Commission on Peace Officer Standards and Training ("POST"). As participating agencies, defendants agree to abide by the standards established by POST. Defendants' conduct, as alleged herein, failed to comply with POST guidelines on

crowd management, intervention, and control.

96.     The need for training and discipline to enforce constitutional guarantees in peaceful demonstrations is obvious, yet Defendants have failed to promulgate adequate policies in accordance with federal law and/or to train its command staff and officers on appropriate policies, if any exist.

97.     The City has known of the deficiencies in the training of its officers in such circumstances since at least 2000 and entered into a settlement agreement in June 2005 and June 2009, each time agreeing to revised policies and training, yet the City has failed to promulgate adequate policies effectuating the terms of the settlement agreement and/or to train its command staff and officers on the revised policies, if any exist. This constitutes a separate *Monell* violation from those outlined above.

98.     The City is well aware of its constitutional duties in these circumstances in light of the settlement agreements and consent judgments discussed below in *National Lawyers Guild v. City of Los Angeles* and *Multi-Ethnic Worker Organizing Network v. City of Los Angeles. City of Los Angeles*, as well as other settlements entered into specifying these constitutional duties over the years.

### 1.  The Settlement in *National Lawyers Guild v. City of Los Angeles*

99.     In June 2005, the City of Los Angeles entered into a settlement agreement in *National Lawyers Guild, et al. v. City of Los Angeles, et al.*, CV 01-6877 FMC (CWx), an action arising from the disruption of lawful assemblies and use of unlawful force during the Democratic National Convention ("DNC") in Los Angeles in 2000 and a subsequent demonstration on October 22, 2000. The settlement provided for important changes in the policy and practices of the LAPD as applied to demonstrations.

100.    Significantly, the settlement addressed the use of LLMs and chemical irritants to disperse peaceful protesters. Also, the settlement provided that, prior to declaring an unlawful assembly, the LAPD Incident Commander should evaluate the

feasibility of isolating and arresting those responsible for any unlawful conduct, and if feasible, take action only against those individuals.

**2. The Settlement in *Multi-Ethnic Worker Organizing Network v. City of Los Angeles* ("MIWON")**

101. On May 1, 2007 ("May Day"), the LAPD assaulted a peaceful, permitted immigration march in the MacArthur Park area of Los Angeles. Like here, the attack on demonstrators was without warning. No dispersal order was given until more than three minutes into the police action and, even then, the dispersal order was grossly inadequate, given from helicopters in English to a largely Spanish-speaking assembly. During the course of litigating the MIWON action, the LAPD conceded that it had not fully implemented training and policy orders regarding the NLG settlement two years earlier. In fact, no policy changes were ever finalized.

102. On June 24, 2009, the federal district court approved and entered a Structural Relief Order as part of the settlement of the class action lawsuit brought on behalf of all those subjected to the LAPD's May Day action.

103. In a section titled "Use of Less Lethal Weapons", the Order states:

    a. Less-lethal munitions may be deployed on ***aggressive and/or combative suspects*** in a crowd control situation, on suspects who are a ***potential physical threat*** to themselves or others, or suspects displaying 'aggressive' and/or 'combative' actions.

    b. For the purpose of deployment of less-lethal munitions, 'aggressive' and/or 'combative' actions include ongoing destruction of property that presents a threat to the personal safety of officers or others.

    c. Less lethal weapons should not be used on a lawfully dispersing crowd or individual.

    d. Less lethal weapons ***should not be used against a person or a crowd that is retreating*** unless the person or crowd continues to

engage in unlawful activity that is aggressive and/or combative.

e.    Where feasible, ***notice should be given to the crowd before less lethal weapons are deployed*** in a crowd control or dispersal situation, and where feasible, it should be given in the language(s) spoken by those assembled.

f.    If the LAPD resumes the use of stinger rounds, the LAPD will publish a notice that will require that less-lethal stinger weapons can be used only with the approval of a staff officer (i.e., commander or above) and only in a riotous situation where the use of lethal force would not be reasonable.

(emphasis added).

104.  As demonstrated throughout this Complaint, *none* of the conditions authorizing the use of LLMs in the Order existed when LAPD officers indiscriminately shot at the crowd, striking and injuring Plaintiff by less lethal munition on May 29, 2020.

105.  Moreover, the Order set out specific requirements to declare an unlawful assembly: an amplified loudspeaker system with an officer at the far side of the crowd to record the officer; if there is no serious violence occurring, the order shall be made repeatedly over a period of time, including an "objectively reasonable period of time to disperse and identification of "a clear and safe route" to follow to disperse. The order should be given so that it is heard by the entire crowd. These requirements were not met in this instance at the location(s) where plaintiff was demonstrating and at the site where he sustained injuries. At no time did plaintiff receive a dispersal order or warning prior to being shot and injured.

106.  The terms of the *MIWON* structural relief agreement were to be included in the LAPD's Crowd Control and Use of Force Manuals and every officer at the rank of Sergeant I and above, as well as the entire Metropolitan Division, were to undergo training every two years. Chief Moore, as well as those members of his

**SECOND AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF; DEMAND FOR JURY TRIAL**

command staff to whom he has delegated his responsibility to enact and implement lawful policies for responding to demonstrations, are aware of the unlawful policies, practices, and customs of the City and the LAPD which resulted in the settlement in *National Lawyers Guild v. City of Los Angeles* in June 2005.

### 3.   The Settlement in *Aichele v. City of Los Angeles*

107.   A class action for injunctive relief and damages for arrests and related actions regarding the shutdown of Occupy LA's use of the City Hall lawn in 2011. The $2.45 million settlement in *Aichele v. City of Los Angeles*, No. CV 12-10863-DMG (FFMx) (C.D. Cal.) included that LAPD officers should not "kettle" protestors attempting to comply with a dispersal order.

### 4.   The Settlement in *Charmaine Chua, et al. v. City of Los Angeles*

108.   Merely two weeks prior to George Floyd's murder, a federal district court judge entered a final judgment in *Charmaine Chua, et al. v. City of Los Angeles, et al.*, 2:16-CV-00237 (C.D. Cal. 2020) against the City of Los Angeles in a class action settlement involving City's unconstitutional crowd control tactics during the 2014 protests following the Ferguson Grand Jury decision not to indict the officer who shot and killed Michael Brown.

## VI.

## PUNITIVE/EXEMPLARY DAMAGES ALLEGATIONS

**(Against individual Defendants Chief Michael Moore, Jorge Rodriguez, Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers and DOES 1-10)**

109.   Each Defendants' conduct as alleged herein was done with reckless disregard for human life, oppression, and malice. Defendants, and each of them, were fully aware of the serious and demonstrable risk of serious bodily injury and death associated with deploying LLMs against peaceful protesters such as plaintiff, and that such risks are compounded when used to strike vulnerable and sensitive parts of Plaintiff's person with LLMs—such as his head. With full knowledge of such risks,

and that the use of LLMs in such circumstances is unlawful, defendants proceeded to unlawfully fire LLMs at plaintiff and/or recommend, authorize, and ratify the use of LLMs against plaintiff, all of which resulted in plaintiff sustaining severe physical, mental and emotional harm.

110. Defendants authorized and executed the unlawful deployment of LLMs with malice and with the specific intent to injure, debilitate, and incapacitate plaintiff physically and to deny, impede and constrain plaintiff's Constitutional rights and dissuade plaintiff from participating in future demonstrations.

111. The Defendant officers, and each of them, acted with malice and oppression and with a conscious disregard for plaintiff's rights, making the individual defendants, including DOES 1-10, liable for punitive damages.

## VII.
## CLAIMS FOR RELIEF
## FIRST CLAIM FOR RELIEF
### Excessive Force
### Fourth & Fourteenth Amendments
### (42 U.S.C. § 1983)
### (Against all Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers, and DOES 1-10)

112. Plaintiff realleges and incorporates herein by reference each of the preceding paragraphs, and all subsequent paragraphs of this Complaint.

113. All of the acts of Defendants and the persons involved were done under color of state law.

114. The acts of the Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers deprived Mr. Zuniga of rights, privileges, and immunities secured by the Constitution and laws of the United States, including but not limited to his rights under the Fourth Amendment of the United States Constitution, incorporated and made applicable to the states by the Fourteenth

Amendment, by, among other things, subjecting him to unreasonable and excessive force.

115.    Each of the Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers was both personally involved and an integral participant in the violation of Mr. Zuniga's constitutional rights because each officer was aware of the unlawful actions of the other Officers, did not object to these violations of Mr. Zuniga's rights, and participated in the violations by performing police functions, including meaningful participation in the needless and unnecessary operation to escalate the encounter with Mr. Zuniga and use unjustified less-than-lethal force.

116.    With no lawful basis, reasonable suspicion, probable cause, or warrant, Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers intentionally and unlawfully seized plaintiff's persons by restraining Plaintiff with the use of LLMs, in a manner that resulted in Plaintiff shot in the head rendering him incapacitated and unable to leave. Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers could not have reasonably believed that Plaintiff had committed or was about to commit any crime or public offense, particularly since plaintiff was unarmed, non-violent, and engaged in lawful activity when he was shot in the head by Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers indiscriminate deployment of LLM weapons at a crowd.

117.    With no lawful basis, reasonable suspicion, probable cause, or warrant, Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers used excessive a force on Plaintiff by unjustifiably firing LLMs at Plaintiff and striking Plaintiff in the head, causing severe physical injury when there was no reason to so restrain Plaintiff. Plaintiff's injuries resulting from Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers firing LLMs indiscriminately at a crowd were known consequences from this type of abusive

police behavior.

118.   Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers knew or should have known that using excessive force against Plaintiff in this manner and detaining Plaintiff without reasonable suspicion or probable cause was a clearly established violation of the Fourth Amendment at the time of the incident.

119.   As a direct and proximate result of Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers's unlawful conduct, plaintiff suffered severe physical injury, emotional distress, humiliation and is entitled to monetary damages.

120.   The conduct of Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers and DOES 1-10 was willful, wanton, malicious, and done with an evil motive and intent and a reckless disregard for the rights of the Plaintiff and therefore warrants the imposition of exemplary and punitive damages against each individual Defendant (but not the entity Defendant) in an amount adequate to punish the wrongdoers and deter future misconduct.

## SECOND CLAIM FOR RELIEF

### Failure to Intervene

### Fourth & Fourteenth Amendments

### (42 U.S.C. § 1983)

### (Against all Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers)

121.   Plaintiff realleges and incorporates herein by reference each of the preceding paragraphs of this complaint, and any subsequent paragraphs.

122.   All of the acts of Defendants and the persons involved were done under color of state law.

123.   The acts of the Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers deprived Mr. Zuniga of rights, privileges, and

immunities secured by the Constitution and laws of the United States, including but not limited to his rights under the Fourth Amendment of the United States Constitution, incorporated and made applicable to the states by the Fourteenth Amendment, by, among other things, failing to intervene in the unlawful actions of other officers, including pointing their weapons at Mr. Zuniga and shooting him in the head with LLMs without justification. Plaintiff's injuries resulting from the Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers firing LLMs indiscriminately at a crowd were known consequences from this type of abusive police behavior.

124.   Each of the Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers was both personally involved and an integral participant in the violation of Mr. Zuniga's constitutional rights because each officer was aware of the unlawful actions of the other Officers, did not object to these violations of Mr. Zuniga's rights, and participated in the violations by performing police functions, including meaningful participation in the needless and unnecessary operation to escalate the encounter with Mr. Zuniga and use unjustified less-than-lethal force.

125.   As a direct and proximate result of Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers's unlawful conduct, plaintiff suffered severe physical injury, emotional distress, humiliation and is entitled to monetary damages.

126.   The conduct of Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers and DOES 1-10 was willful, wanton, malicious, and done with an evil motive and intent and a reckless disregard for the rights of the Plaintiff and therefore warrants the imposition of exemplary and punitive damages against each individual Defendant (but not the entity Defendant) in an amount adequate to punish the wrongdoers and deter future misconduct.

///

SECOND AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF; DEMAND FOR JURY TRIAL

# THIRD CLAIM FOR RELIEF

## Municipal Liability—Unconstitutional Policy, Practice, Custom

## (42 U.S.C. § 1983)

## (Against Defendants City of Los Angeles, Chief Michael Moore and DOES 7-10)

127. Plaintiff realleges and incorporates herein by reference each of the preceding paragraphs of this complaint, and any subsequent paragraphs.

128. As described above, the acts of Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers deprived Plaintiff David Zuniga of his rights under the United States Constitution.

129. All of the acts of Defendants and the persons involved were done under color of state law.

130. Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers acted pursuant to expressly adopted official policies or longstanding practices or customs of Defendants CITY OF LOS ANGELES, CHIEF MICHAEL MOORE and DOES 9 and 10.

131. Based on the aforementioned facts, Defendants City Of Los Angeles, Chief Michael Moore and DOES 9 and 10 as policymakers and supervisors maintained the following unconstitutional customs, practices, and policies:

    a. Using excessive force, including excessive "less lethal" force in crowd control situations including but not limited to engaging with peacefully protesting individuals;

    b. Providing inadequate training regarding the use of "less lethal" force in crowd control situations, including during encounters with individuals who are peacefully protesting;

    c. Employing and retaining as Officers and other personnel, including Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers, City Of Los Angeles, Chief Michael Moore and DOES 9 and 10 at all times material herein,

knew or reasonably should have known had dangerous propensities for abusing their authority and for mistreating citizens by failing to follow written LAPD policies and for using excessive force;

d. Inadequately supervising, training, controlling, assigning, and disciplining LAPD officers including Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers, City of Los Angeles, Chief Michael Moore and DOES 9 and 10 each knew, or in the exercise of reasonable care, should have known had the aforementioned propensities and character traits;

e. Maintaining grossly inadequate procedures for reporting, supervising, investigating, reviewing, and disciplining and controlling the intentional misconduct by LAPD Officers including Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers;

f. Failing to adequately discipline LAPD Officers, including Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers, for the above-referenced categories of misconduct, including "slaps on the wrist," discipline that is so slight as to be out of proportion to the magnitude of the misconduct, and other inadequate discipline that is tantamount to encouraging misconduct;

g. Announcing that unjustified uses of force are "within policy," including uses of force later determined in court to be unconstitutional;

h. Refusing to discipline, terminate, or retrain the Officers involved, even where uses of force were determined in court to be unconstitutional and where Officers commit repeated

constitutional violations;

i.  Encouraging, accommodating, or facilitating a "blue code of silence," "blue shield," "blue wall," "blue curtain," "blue veil," or simple "code of silence," pursuant to which Officers do not report other Officers' errors, misconduct or crimes. Pursuant to this code of silence, if questioned about an incident of misconduct involving another officer, while following the code, the officer being questioned will claim ignorance of the other Officers' wrongdoing;

j.  Maintaining a policy of inaction and an attitude of indifference towards soaring numbers of police uses of force, including by failing to discipline, retrain, investigate, terminate, and recommend Officers for criminal prosecution who participate in using excessive force against unarmed people;

k.  Covering up police misconduct and refusing to release information about police misconduct to the public even when required to do so by law. These customs and practices by Defendants City Of Los Angeles, Chief Michael Moore and DOES 7-10 were condoned by said Defendants in deliberate indifference to the safety and rights of its civilians, including Plaintiff.

l.  Failing to follow or enforce compliance by Officers with the LAPD's own policies.

m.  Failing to follow or enforce compliance by Officers with national law enforcement training and standards.

132.  Defendants City of Los Angeles, Chief Michael Moore and DOES 7-10 together with various other officials, whether named or unnamed, had either actual or constructive knowledge of the different policies, practices, and customs alleged in the

paragraphs above. Despite having knowledge as stated above, these Defendants condoned, tolerated and through actions and inactions ratified such policies. Said Defendants also acted with deliberate indifference to both the foreseeable effects and consequences of these policies and to the constitutional rights of Plaintiff, and other individuals similarly situated.

133.   By perpetuating, sanctioning, tolerating, and ratifying the outrageous conduct and other wrongful acts, Defendants City Of Los Angeles, Chief Michael Moore and DOES 7-10 acted with an intentional, reckless, callous disregard for the well-being of Mr. Zuniga and his constitutional as well as human rights. Furthermore, the policies, practices, and customs implemented, maintained, and still tolerated by Defendants City Of Los Angeles, Chief Michael Moore and DOES 7-10 were affirmatively linked to and were a significantly influential and moving force behind the injuries of Mr. Zuniga.

134.   As a direct and proximate result of the aforementioned acts or omissions of Defendants, Mr. Zuniga sustained and incurred damages including pain, suffering, and emotional injury.

135.   The conduct of Defendants City Of Los Angeles, Chief Michael Moore and DOES 7-10 was willful, wanton, malicious, and done with an evil motive and intent and a reckless disregard for the rights of the Plaintiff and therefore warrants the imposition of exemplary and punitive damages against each individual Defendant (but not the entity Defendant) in an amount adequate to punish the wrongdoers and deter future misconduct.

## FOURTH CLAIM FOR RELIEF

### Municipal Liability—Ratification

### (42 U.S.C. § 1983)

### (Against Defendants City of Los Angeles, Chief Michael Moore, and DOES 9 and 10)

136.   Plaintiff realleges and incorporates herein by reference each of the

preceding paragraphs of this complaint, and any subsequent paragraphs.

137.   As described above, the acts of Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers deprived Plaintiff David Zuniga of his rights under the United States Constitution.

138.   All of the acts of Defendants and the persons involved were done under color of state law.

139.   Upon information and belief, the Defendants City Of Los Angeles, Chief Michael Moore and DOES 9 and 10, as final policymakers, acting under color of law, who had final policymaking authority concerning the acts of Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers ratified the individual Defendants' acts and the bases for them. Upon information and belief, the final policymakers knew of and specifically approved of the individual Defendants' acts and found them to be justified and within policy.

140.   Upon information and belief, the Defendants City Of Los Angeles, Chief Michael Moore and DOES 9 and 10 as final policymakers, acting under color of law, have a history of ratifying unreasonable uses of force, including unreasonable less than lethal force.

141.   As a direct and proximate result of the aforementioned acts or omissions of Defendants, Mr. Zuniga sustained and incurred damages including pain, suffering, and emotional injury.

142.   The conduct of Defendants City of Los Angeles, Chief Michael Moore and DOES 9 and 10 was willful, wanton, malicious, and done with an evil motive and intent and a reckless disregard for the rights of the Plaintiff and therefore warrants the imposition of exemplary and punitive damages against each individual Defendant (but not the entity Defendant) in an amount adequate to punish the wrongdoers and deter future misconduct.

///

///

# FIFTH CLAIM FOR RELIEF

## Municipal Liability— Failure to Train, Supervise, Discipline, or Correct

## (42 U.S.C. § 1983)

## (Against Defendants City of Los Angeles, Chief Michael Moore, and DOES 9 and 10)

143.   Plaintiff realleges and incorporates herein by reference each of the preceding paragraphs of this complaint, and any subsequent paragraphs.

144.   As described above, the acts of Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers deprived Plaintiff David Zuniga of his rights under the United States Constitution.

145.   All of the acts of Defendants and the persons involved were done under color of state law.

146.   Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers acted pursuant to expressly adopted official policies or longstanding practices or customs of Defendants City of Los Angeles, Chief Michael Moore and DOES 9 and 10.

147.   On information and belief, Defendants CITY OF LOS ANGELES, CHIEF MICHAEL MOORE and DOES 9 and 10, acting under color of law, failed to properly and adequately train Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers, including but not limited to, with regard to the use of physical force and less than lethal force.

148.   In addition, the training policies of the City of Los Angeles were not adequate to train its officers to handle the usual and recurring situations with which they must deal, including but not limited to encounters with individuals who are peacefully exercising their First Amendment rights. The City of Los Angeles failed to adequately train its officers on public order policing, using the LLMs in crowd control situations, and isolating and removing small groups of violent or criminal individuals within a larger group of peaceful protestors, and failed to adequately

supervise, direct, and/or coordinate its officers' deployment of the LLMs during the protests.

149.    The City of Los Angeles knew that its failure to adequately train its officers on public order policing, using the LLMs in crowd control situations, and isolating and removing small groups of violent or criminal individuals within a larger group of peaceful protestors made it highly predictable that its officers would engage in conduct that would deprive persons such as Mr. Zuniga of their rights. The City of Los Angeles knew that its failure to adequately supervise, direct, and/or coordinate its officers' deployment of LLMs made it highly predictable that its officers would engage in conduct that would deprive persons such as Mr. Zuniga of their rights. The City of Los Angeles was thus deliberately indifferent to the obvious consequences of its failure to train its officers adequately.

150.    Properly trained officers are trained to facilitate peaceful protestors' exercise of their First Amendment rights.

151.    Properly trained officers are trained to use less than lethal force only in response to someone violently resisting arrest or who poses an immediate threat of violence or physical harm. Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers used such force against Mr. Zuniga even though he was not violently resisting arrest and posed no immediate threat of violence or physical harm to the Officers or anyone else.

152.    Defendants City of Los Angeles, Chief Michael Moore and DOES 9 and 10 furthermore failed to enforce compliance by LAPD Officers with national law enforcement training and standards.

153.    Defendants City of Los Angeles, Chief Michael Moore and DOES 9 and 10 were deliberately indifferent to the obvious consequences of its failure to train their Officers adequately. They knew that the failure to adequately train their Officers made it highly predictable that their Officers would engage in conduct that would deprive persons of their constitutional rights.

1      154.   The failure of Defendants City Of Los Angeles, Chief Michael Moore

2 and DOES 9 and 10 to provide adequate training regarding, inter alia, the use of

3 40mm in crowd control situations, resulted in the wrongful uses of force against Mr.

4 Zuniga. The failure of Defendants City Of Los Angeles, Chief Michael Moore and

5 DOES 9 and 10 to provide adequate training caused the deprivation of Mr. Zuniga's

6 rights by Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia,

7 Gregory Sayers; that is, Defendants' failure to train is so closely related to the

8 deprivation of Mr. Zuniga's rights as to the be moving force that caused the ultimate

9 injury.

10      155.   As a direct and proximate result of the aforementioned acts or omissions

11 of Defendants, Mr. Zuniga sustained and incurred damages including pain, suffering,

12 and emotional injury.

13      156.   The conduct of Defendants City Of Los Angeles, Chief Michael Moore

14 and DOES 9 and 10 was willful, wanton, malicious, and done with an evil motive and

15 intent and a reckless disregard for the rights of Mr. Zuniga and therefore warrants the

16 imposition of exemplary and punitive damages against each individual Defendant

17 (but not the entity Defendant) in an amount adequate to punish the wrongdoers and

18 deter future misconduct.

19 **<u>SIXTH CLAIM FOR RELIEF</u>**

20 **SUPERVISORY LIABILITY CAUSING CONSTITUTIONAL VIOLATIONS**

21 **(42 U.S.C. § 1983)**

22 **(Against Defendants Chief Michael Moore and Jorge Rodriguez)**

23      157.   Plaintiff realleges and incorporates herein by reference each of the

24 preceding paragraphs of this complaint, and any subsequent paragraphs.

25      158.   This claim is brought against Defendants Chief Michael Moore and

26 Jorge Rodriguez in their personal capacity based upon their personal conduct and

27 actions during the protests in question. This claim is brought against Defendants

28 Chief Michael Moore and Jorge Rodriguez in their individual capacities as

supervisors with the Los Angeles Police Department. "A defendant may be held liable as a supervisor under § 1983 if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011). Indeed, "[a] supervisor can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Id.*

159.  As previously alleged, Defendant Chief Michael Moore is, and at all times material hereto was, the LAPD police chief.  Upon information and belief, Chief Moore was present in person at the demonstration in Downtown Los Angeles on May 29, 2020 when Plaintiff sustained injuries following use of "less lethal" projectiles by law enforcement.

160.  As previously alleged, Defendant Jorge Rodriguez is, and at all times material hereto was, a Deputy Chief with the LAPD and assigned to the position of Incident Commander of the Central Bureau during the Floyd protests, covering Downtown Los Angeles ("DTLA"), for "B" watch during which time Plaintiff sustained injuries following use of "less lethal" projectiles by law enforcement. Rodriguez participated in recommending and authorizing the deployment of "less lethal" munitions that injured Plaintiff.

161.  The decision to exercise unreasonable force by deploying LLMs against Plaintiff and the crowd of peaceful demonstrators was recommended and authorized by Defendants Chief Moore and Rodriguez. The use of LLMs against protesters was authorized at or around 7 p.m. on May 29, 2020 and continued well beyond the time that Plaintiff was injured.

162.  Furthermore, Defendants Aaron Green, Jesus Garcia, and Gregory Sayers, as also ordered by Defendants Daniel Bunch and Jesus Garcia, fired LLMs at

Plaintiff, thereby incapacitating Plaintiff and causing severe and permanent physical injuries. Upon information and belief, the use of LLMs by Defendants Aaron Green, Jesus Garcia, and Gregory Sayers was authorized by Defendants Daniel Bunch and Jesus Garcia in consultation with Rodriguez and ratified by Chief Moore.

163.   Clearly, Defendants Chief Moore and Rodriguez were personally involved Plaintiff's constitutional deprivation by depriving him of his Fourth and Fourteenth Amendment rights.

164.   In addition to Defendants Chief Moore and Rodriguez being personally involved in Plaintiff's constitutional violation, Defendants Chief Moore and Rodriguez are also liable  for their own culpable action or inaction in the training, supervision, or control of his subordinates; for their acquiescence in the constitutional deprivation; and for conduct that showed a reckless or callous indifference to the rights of others, including Plaintiffs.

165.   Indeed, Defendants Chief Moore and Rodriguez were clearly reckless or callous indifferent to the rights of protesters including Plaintiffs by authorizing the categorical use of force without particularized need for use of force. Defendants Chief Moore and Rodriguez emboldened and authorized Defendants Daniel Bunch, Jesus Garcia, Aaron Green, Jesus Garcia, and Gregory Sayers to use force on Plaintiff through their orders and conduct during the subject protests.

166.   As a direct and proximate result of the aforementioned acts or omissions of Defendants Chief Moore and Rodriguez, Mr. Zuniga sustained and incurred damages including pain, suffering, and emotional injury.

167.   The conduct of Defendants Chief Moore and Rodriguez was willful, wanton, malicious, and done with an evil motive and intent and a reckless disregard for the rights of Mr. Zuniga and therefore warrants the imposition of exemplary and punitive damages against each individual Defendant (but not the entity Defendant) in an amount adequate to punish the wrongdoers and deter future misconduct.

///

## SEVENTH CLAIM FOR RELIEF

### Declaratory Relief

### (28 U.S.C § 2201)

### (Against All Defendants)

157.   Plaintiff realleges and incorporates herein by reference each of the preceding paragraphs of this complaint, and any subsequent paragraphs.

158.   There is an actual controversy between Plaintiff and Defendants concerning their respective rights and duties in that Plaintiff contends that the acts of Defendants, as described herein, are in violation of federal law, and Defendants contend in all aspects to the contrary.

159.   Plaintiff is entitled to a legal declaration of his rights and Defendants' obligations under the applicable laws as alleged in this Complaint.

## EIGHTH CLAIM FOR RELIEF

### Violation of Bane Act

### (California Civil Code § 52.1)

### (Against All Defendants)

157.   Plaintiff realleges and incorporates herein by reference each of the preceding paragraphs of this complaint, and any subsequent paragraphs.

158.   Plaintiff brings this cause of action against all Defendants by operation of state law. Plaintiff has complied with the California Tort Claims Act requirements as fully set forth above.

159.   All Defendants, including Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers, and each of them, by doing and/or causing the acts complained of in this entire Complaint, interfered by threats, intimidation, or  coercion, with the exercise and enjoyment of Plaintiff's rights as secured by the First, Fourth, and Fourteenth Amendments to the United States Constitution and laws of the United States, and the rights secured by the Constitution and laws of the State of California.

160.   Defendants, including Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers engaged in threatening, intimidating, and coercive tactics by using excessive force against Plaintiff with LLMs while Plaintiff was lawfully present at a peaceful demonstration, and thereby chilling his First Amendment activity. There was no lawful justification for defendants to threaten, intimidate, or coerce Plaintiff or to attempt to use threats, intimidation, or coercion to interfere with Plaintiff's rights to lawfully participate in a peaceful demonstration.

161.   Defendant entity City of Los Angeles are liable to plaintiff for the acts of their public employees, the individual defendants herein, for conduct and/or omissions herein alleged, pursuant to the doctrine of respondent superior, codified at California Government Code § 815.2.

162.   Defendants Michael Moore; Jorge Rodriguez are liable to plaintiff under vicarious liability given their orders and management of LAPD Officers and including Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers.

163.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff suffered severe physical injury, emotional distress, humiliation and is entitled to monetary damages, including statutory damages, and attorneys' fees.

164.   The Defendant officers acted with malice and oppression and with a conscious disregard for Plaintiff's rights, making the individual defendants, including Does 7-10, liable for punitive damages under California Civil Code § 3294.

165.   Defendant entity City of Los Angeles is liable to Plaintiff for the acts of their public employees, the individual defendants herein, for conduct and/or omissions herein alleged, pursuant to the doctrine of respondent superior, codified at California Government Code § 815.2.

///

///

///

## NINTH CLAIM FOR RELIEF

### Assault

### (Against All Defendants)

166.   Plaintiff realleges and incorporates herein by reference each of the preceding paragraphs of this complaint, and all subsequent paragraphs.

167.   This cause of action arises under the general laws and Constitution of the State of California. Plaintiff has complied with the California Tort Claims Act requirements.

168.   As described in detail herein above, Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers assaulted Plaintiff by acting intentionally to place Plaintiff in reasonable apprehension of immediate harmful or offensive contact by, inter alia, aiming LLM and live firearms at Plaintiff, firing LLMs at Plaintiff, hitting Plaintiff with rubber bullets, and using force upon Plaintiff, and had the present ability to cause such contact.

169.   As a direct and proximate result of the acts and conduct of Defendants, and each of them, at the time and place herein alleged, Plaintiff suffered fear of immediate harmful or offensive touching by LLMs or other weapons wielded by Defendants, and each of them.

170.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff suffered the injuries and damages as herein alleged. Defendants, except City, acted with malice and oppression and with a conscious disregard for Plaintiff's rights, making the individual defendants, including Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers, liable for punitive damages under California Civil Code § 3294.

171.   Defendant entity City of Los Angeles is liable to Plaintiff for the acts of their public employees, the individual Defendants herein, for conduct and/or omissions herein alleged, pursuant to the doctrine of respondent superior, codified at California Government Code § 815.2.

172.   Defendants Michael Moore; Jorge Rodriguez are liable to plaintiff under vicarious liability given their orders and management of LAPD Officers and including Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers.

## TENTH CLAIM FOR RELIEF

### Battery

### (Against All Defendants)

173.   Plaintiff realleges and incorporates herein by reference each of the preceding paragraphs of this complaint, and all subsequent paragraphs.

174.   This cause of action arises under the general laws and Constitution of the State of California. Plaintiff has complied with the California Tort Claims Act requirements.

175.   Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers, and each of them, battered Plaintiff, as alleged in this complaint, when said Defendants acted intentionally to cause, and did cause, said non-consensual, unprivileged, unjustified, excessive, harmful, or offensive contact to Plaintiff's person by hitting Plaintiff with LLMs on various parts of Plaintiff's person, including the head, and causing Plaintiff the injuries and damages as herein alleged.

176.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiff suffered the injuries and damages as herein alleged.

177.   Defendants, except City, acted with malice and oppression and with a conscious disregard for Plaintiff's rights, making the individual defendants, including Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers, liable for punitive damages under California Civil Code § 3294.

178.   Defendant entity City of Los Angeles is liable to Plaintiff for the acts of their public employees, the individual defendants herein, for conduct and/or

omissions herein alleged, pursuant to the doctrine of respondent superior, codified at California Government Code § 815.2.

179.   Defendants Michael Moore; Jorge Rodriguez are liable to plaintiff under vicarious liability given their orders and management of LAPD Officers and including Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers.

## ELEVENTH CLAIM FOR RELIEF

### Negligence

### (Against All Defendants)

180.    Plaintiff realleges and incorporates herein by reference each of the preceding paragraphs of this complaint, and all subsequent paragraphs.

181.   This cause of action arises under the general laws and Constitution of the State of California. Plaintiff has complied with the California Tort Claims Act requirements.

182.   For purposes of this cause of action only, allegations are deemed to sound in negligence, and set forth pursuant to California Civil Code Section §1714 and California common law.

183.   At all times material herein, Defendants—as a law enforcement agency and personnel charged with executing their duties without the threat of unreasonable risk to Plaintiff—and each of them, had a duty to act reasonably to avoid, or foresee, the risk that said Defendants themselves, or their colleagues or subordinates, would commit the acts complained of herein, including but not limited to: (a) encountering and physically harming a person such as Plaintiff who was present at a peaceful demonstration and (b) authorizing and using LLMs inappropriately as crowd control devices.

184.   Defendant entity City of Los Angeles had a duty to act reasonably to foresee and avoid the risk that said Defendants themselves, or their colleagues or subordinates, would commit the acts complained of herein.

185.    Defendants, and each of them, breached their duty of care by not acting reasonably under the circumstances of such risk, as described herein above, and/or by impeding otherwise curtailing the civil rights of, or endangering, without lawful basis, Plaintiff.

186.    Specifically, Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers, and each of them, breached their duty of care and failed to act toward Plaintiff as a reasonable law enforcement officer would in similar circumstances by firing LLMs at Plaintiff, who was peacefully present at a demonstration, and by failing to take proper precautions when using such unwarranted crowd control tactics by, inter alia, aiming and firing at Plaintiff on parts of Plaintiff's person which should not be targeted by LLMs, including but not limited to the head. At all times herein relevant, other less dangerous and intrusive crowd control tactics were available to each defendant.

187.    Individual Defendants Moore, Rodriguez and DOES 7-10 breached their duty of care and failed to act as a reasonable law enforcement official would in similar circumstances by recommending, authorizing and ratifying the use of LLMs and other weapons against Plaintiff when other less dangerous and intrusive crowd control tactics were available, and/or recommending, authorizing, and ratifying the use of LLMs against Plaintiff in an improper manner such as striking parts of Plaintiff's person that should not be targeted by LLMs, including but not limited to the head.

188.    At all times herein relevant, Defendants, and each of them, failed to follow established guidelines, rules and procedures—including their own—for the use of LLMs and crowd control tactics, and the City specifically breached its court-ordered mandate issued in *MIWON* related to the use of force at demonstrations.

189.    At all times herein relevant, Defendant entity City of Los Angeles and individual defendants Moore, Rodriguez and Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers, and each of them, breached

48

their duty of care by not acting reasonably under the circumstances of such risk, as described herein above, and/or by failing to discharge their respective duties to appropriately screen and train their employees, investigate and discipline their employees for misconduct, and acting negligently by authorizing and ratifying the use of LLMs, and providing improper training that condoned the escalatory and dangerous tactics employed by Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers which resulted in harm to Plaintiff.

190.   Each Defendant's aforesaid breaches of duty were each a direct and proximate cause of the injuries and damages suffered by Plaintiff, as alleged in this complaint.

191.   Defendant entity City of Los Angeles is liable to Plaintiff for the acts of their public employees, the individual defendants herein, for conduct and/or omissions herein alleged, pursuant to the doctrine of respondent superior, codified at California Government Code § 815.2.

192.   Defendants Michael Moore; Jorge Rodriguez are liable to plaintiff under vicarious liability given their orders and management of LAPD Officers and including Defendants Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory Sayers.

## VIII.

## REQUEST FOR RELIEF

Wherefore, plaintiff respectfully requests that the Court enter a judgment as follows:

A.   A declaratory judgment that defendants' conduct detailed herein was a violation of plaintiffs' rights under the Constitutions and laws of the United States and California;

B.   To the extent that the Court finds that defendants' conduct was authorized by custom, policy, or practice, and/or the inadequate training, supervision, instruction and discipline, a declaratory judgment that those

customs, policies, or practices, and/or the inadequate trainings,
supervisions, REQUEST FOR RELIEF instructions and disciplines are
unconstitutional under the Fourth, and Fourteenth Amendments to the
United States Constitution, and the analogous provisions of the
California Constitution;

C.    An award of past and future economic damages against all defendants
for the harms sustained by plaintiff in an amount to be determined
according to proof at the time of trial;

D.    An award of general damages against defendants, and each of them, for
the physical, mental and emotional damages, past and future, according
to proof at the time of trial;

E.    An award of punitive and exemplary damages against the individual
defendants, including Defendants Michael Moore, Jorge Rodriguez,
Daniel Bunch, Miguel Zendejas, Aaron Green, Jesus Garcia, Gregory
Sayers and DOES 1 through 10, in an amount to be determined
according to proof at the time of trial;

F.    An award of attorneys' fees pursuant to 42 U.S.C. §§ 1983, 2986, 1988,
12205, and any other applicable provisions, and

G.    Costs of suit, pre and post-judgment interest as permitted by law; and
any such other relief as the Court may deem just and proper.

Dated: September 21, 2023        GASTÉLUM LAW, APC

By: _Denisse O. Gastélum_
DENISSE O. GASTÉLUM
Attorneys for Plaintiff,
DAVID ZUNIGA

## DEMAND FOR JURY TRIAL

Plaintiff David Zuniga hereby makes a demand for a jury trial in this action.

Dated: September 21, 2023

GASTÉLUM LAW, APC

By: *Denisse O. Gastélum*
DENISSE O. GASTÉLUM
Attorneys for Plaintiff,
DAVID ZUNIGA